IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
: 
KATHLEEN KERRIGAN, ANTHONY           :
HOLIDAY, MICHAEL J. McSHEA,           :
TARIQ MANGUM, RENEE CROSBY, and      :
CAROLYN DAVENPORT, on behalf of       :
themselves and all others similarly situated,  :
                                      :
              Plaintiffs,             :
                                      :         Civil Action No. 07-CV-687
       v.                             :
                                      :         Class Action
THE PHILADELPHIA BOARD OF             :
ELECTIONS and MARGARET M.             :
TARTAGLIONE, EDGAR HOWARD, and       :
JOSEPH DUDA, PHILADELPHIA CITY        :
COMMISSIONERS, in their official capacities,  :
                                      :
              Defendants.             :
_____:

## MOTION FOR PERMANENT INJUNCTION

Plaintiffs, through their counsel, submit this Motion for a Permanent Injunction to challenge Defendants' failure to provide and utilize accessible polling places in the City of Philadelphia to enable their independent use by people with mobility disabilities, particularly those who use wheelchairs. Specifically, numerous polling places designated by Defendants as accessible were, in fact, not accessible on Election Day in November 2007. In addition, there are polling places that Defendants assert cannot be made accessible and did not make accessible for the November 2007 election, but, which, in fact can be made accessible either through temporary modifications or relocation to accessible sites. Defendants failure to assure the accessibility of their polling places violates the Americans with Disabilities Act and the

Rehabilitation Act.  Plaintiffs seek a permanent injunction that will maximize polling place accessibility.

In support of this Motion, Plaintiffs submit the accompanying Memorandum of Law and Exhibits, which are incorporated by reference in this Motion.

Respectfully submitted,

Dated: January 11, 2008          By:   /s/ Robert W. Meek
                                      Robert W. Meek
                                      Attorney I.D. No. 27870
                                      Disability Rights Network of PA
                                      1315 Walnut Street, Suite 400
                                      Philadelphia, PA  19107-4798
                                      (215) 238-8070


                                 By:   /s/ Stephen F. Gold
                                      Stephen F. Gold
                                      Attorney I.D. No. 09880
                                      125 South Ninth Street
                                      Suite 700
                                      Philadelphia, PA  19107
                                      (215) 627-7100


                                 By:   /s/ Seth Kreimer
                                      Seth Kreimer
                                      Attorney I.D. No. 26102
                                      3400 Chestnut Street
                                      Philadelphia, PA  19104
                                      (215) 898-7447

                                      Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____
                                              :
KATHLEEN KERRIGAN, ANTHONY                    :
HOLIDAY, MICHAEL J. McSHEA,                   :
TARIQ MANGUM, RENEE CROSBY, and               :
CAROLYN DAVENPORT, on behalf of               :
themselves and all others similarly situated, :
                                              :
                    Plaintiffs,               :
                                              :    Civil Action No. 07-CV-687
              v.                              :
                                              :    Class Action
THE PHILADELPHIA BOARD OF                     :
ELECTIONS and MARGARET M.                     :
TARTAGLIONE, EDGAR HOWARD, and                :
JOSEPH DUDA, PHILADELPHIA CITY                :
COMMISSIONERS, in their official capacities,  :
                                              :
                    Defendants.               :
_____:

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PERMANENT INJUNCTION

Plaintiffs, through their counsel, submit this Memorandum of Law in support of their

Motion for Permanent Injunction.  Defendants have violated the Americans with Disabilities Act

and the Rehabilitation Act by both (1) failing to assure that polling places they have designated

as "accessible" are in fact accessible to and independently usable by voters with mobility

disabilities on Election Day; and (2) failing to make accessible those polling places that they

have designated as "inaccessible," either by alterations or relocation, when doing so would not

result in a fundamental alteration.  Plaintiffs seek permanent injunctive relief to remedy these

violations.

## FACTUAL BACKGROUND

The continued inaccessibility of Philadelphia's polling places -- even those that Defendants have designated as accessible -- undermines the ability of people with mobility disabilities, particularly those who use wheelchairs, to participate independently in the voting process like their non-disabled neighbors.  Despite the pendency of this lawsuit and a prior lawsuit to increase the accessibility of Philadelphia polling places, the evidence demonstrates that many polling places -- including those that Defendants concede can and should be accessible -- were inaccessible on the most recent election day in November 2007.

Philadelphia is divided into 66 wards with a total of 1,681 polling divisions.  *See Election Notice -- Polling Places Municipal and Special Election Tuesday Nov. 6, 2007*, Phila. Inquirer, Nov. 5, 2007, at A12-A13 ("*Election Notice*") (Exh. A).  These divisions are selected by Defendants, the Philadelphia Board of Elections and the individual City Commissioners. 25 Pa. Cons. Stat. Ann. § 2762(a).  Defendants assign each registered voter to a specific division near their homes.  Registered voters cannot choose the division in which they will vote, and, accordingly, voters with mobility disabilities cannot request that the Defendants reassign them to a division with an accessible polling place.

Prior to each scheduled election day, Defendants publish a notice in local newspapers that lists the polling place location for each division.  *See Election Notice*. This most recent Election Notice published for the general election held on November 6, 2007 included the following "Legend for Polling Place Accessibility for Disabled Voters":

**FH** = Fully Accessible for disabled; designated parking for disabled

**BL/RL** = Building substantially Accessible for disabled with minor assistance, Passenger Loading Zone

**BN/RN** = Building substantially Accessible for disabled with minor assistance, No parking

**AL** = Building Accessible by Alternative entrance, Passenger Loading Zone, Call 215-686-1523

**AN** = Building Accessible by Alternative entrance, No Parking, Call 215-686-1523

**NN** = Building Inaccessible for Disabled, No Parking.

*Id.* Next to each polling division listed in the notice is either one of the designations in the legend or the designation "NL." *See id.* Although not listed in the Legend, the designation "NL" seems to mean that the building where the polling division is located is not accessible, but there is a passenger loading zone. Approximately 194 polling divisions were identified in the November 6, 2007 Election Notice as "NN" or "NL," *i.e.*, inaccessible to voters with mobility disabilities. *See* Resnick Decl. ¶ 15 (Exh. B). Thus, according to the Election Notice, approximately 1,487 of the 1,681 polling divisions should have been accessible through the main entrance usable by non-disabled voters or an alternative entrance (such as a side door, loading dock, or some other location) that a person with a mobility disability could use to gain entrance to the voting machines.

On November 6, 2007, the date of the most recent election, witnesses observed[1] that a number of Philadelphia polling places *designated by Defendants in the Election Notice as accessible* (either fully accessible, substantially accessible, or accessible via alternative entrance), *in fact, were not accessible* to individuals with mobility disabilities (particularly, those who use wheelchairs), including the following which Plaintiffs offer as a sample:[2]

- Ward 2, Division 5 -- Defendants' accessibility designation for the polling place for this division, located in St. Maron's Church at 1013 Ellsworth Street, was "RL." *See Election Notice.* Yet, the two entrances to the polling place both had one step and neither had a ramp in place, making the polling place inaccessible. Resnick Decl. ¶ 3 & Att. 1 (photographs).

- Ward 2, Division 23 -- Defendants' accessibility designation for the polling place for this division, located at the Palumbo Recreation Center, was "RN." *See Election Notice.* The entrance to the polling place had about a 2-inch step and but did not have a ramp in place, making it inaccessible. Although there possibly was an accessible alternative entrance to the facility, it was locked and there was no signage that indicated the availability of an accessible entrance. Resnick Decl. ¶ 4 & Att. 2 (photograph).

- Ward 2, Division 25 -- Defendants' accessibility designation for the polling place for this division, located in a wallpaper store at 707 East Passyunk Avenue, was "RN." *See Election Notice.* The entrance to the polling place had a large step and there was no ramp in place, making it inaccessible. Resnick Decl. ¶ 5 & Att. 3 (photographs).

---

[1] These witnesses included counsel for the Plaintiffs as well as volunteers organized and trained by the Committee of Seventy. *See* Resnick Decl. ¶ 2; Fulton Decl. ¶¶ 4, 7 (Exh. C). The Committee of Seventy is a non-profit, non-partisan Philadelphia organization that works on issues relating to voting rights. *See* Fulton Decl. ¶ 3. The Committee of Seventy uses volunteers on election days to survey polling places for a variety of issues. *See id.* ¶¶ 4, 5, 7. In recent elections, including the November 6, 2007 general election, the survey forms completed by volunteers included issues relating to accessibility for voters with mobility disabilities. *Id.* ¶¶ 5, 6.

[2] All polling places were not visited during the November 2007 general election. The evidence gathered, however, is sufficient to establish Defendants' violations of the ADA and to justify relief that assures the accessibility of all polling places to the maximum extent feasible.

■ Ward 3, Division 1 -- Defendants' accessibility designation for the polling place for this division, located in a beauty salon at 121 South 60th Street, was "BN." *See Election Notice*. The entrance was not wheelchair accessible and there was no ramp in place. Earle Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. D).

■ Ward 3, Division 7 -- Defendants' accessibility designation for the polling place for this division, located at the Education Outreach Center at 5901 Spruce Street, was "AN." *See Election Notice*. There were three steps down to reach the polling place and no ramp was in place, making it inaccessible. Earle Decl. ¶ 4 & Att. 2 (Committee of Seventy form).

■ Ward 4, Divisions 3 and 9 -- Defendants' accessibility designation for the polling place for these divisions, located in a "church property" at 5544 Girard Avenue, was "BN." *See Election Notice*. The entrance had five steps at the entrance and was not accessible. Resnick Decl. ¶ 6 & Att. 4 (photographs).

■ Ward 4, Division 10 -- Defendants' accessibility designation for the polling place for this division, located in a residence at 1412 North Frazier Street, was "BN." *See Election Notice*. The entrance had five steps and no ramp in place, making it inaccessible. Resnick Decl. ¶ 7 & Att. 5 (photograph).

■ Ward 4, Divisions 14 and 15 -- Defendants' accessibility designation for the polling place for these divisions, located at Shepard Recreation Center at 57th Street and Haverford Avenue, was "BL." *See Election Notice*. There were two small steps to enter the building, but there were no ramps in place, making it inaccessible. Resnick Decl. ¶ 8 & Att. 6 (photographs).

■ Ward 4, Division 16 -- Defendants' accessibility designation for the polling place for this division, located at a "church property" at 5546 West Girard Avenue, was "BN." *See Election Notice*. There were two steps to enter the building and no ramp was in place, making it inaccessible. Resnick Decl. ¶ 9 & Att. 7 (photograph).

■ Ward 4, Divisions 17 and 18 -- Defendants' accessibility designation for the polling place for these divisions, located at the Bluford School at 58th & Media Streets, was "BL." *See Election Notice*. The main entrance was not accessible. There was an accessible entrance at the rear, but no signage at the front to indicate that an accessible entrance existed. The voting machines were placed on the stage in the school auditorium that

required voters to go up four steps, making it inaccessible. Shilliday Decl. ¶ 3 & Att. 1 (Committee of Seventy forms) (Exh. E).

■  Ward 12, Division 2 -- Defendants' accessibility designation for the polling place for this division, to which Plaintiff Davenport is assigned and which is located in the Pastorius School at Chelten & Sprague Street, was "BL." *See Election Notice.* As in prior elections, the building was not accessible in the general election in November 2007. Although there is an alternative, accessible entrance, there was no signage and it was locked. As a result Plaintiff Davenport could not access the polling place in her wheelchair and was forced to pull herself up the steps by the handrail, which was both difficult and embarrassing, and then use her walker to get to the voting booth. Davenport Decl. ¶¶ 3-4 (Exh. F).

■  Ward 18, Divisions 14 and 15 -- Defendants' accessibility designation for the polling place for these divisions, located at the Al Aqsa Islamic Society at 1510-11 Germantown Avenue, was "BN." *See Election Notice.* There was an alternative accessible entrance at this location, but it was locked. There was a bell, but no one answered when the Committee of Seventy volunteers rang it even after waiting five minutes. Way Decl. ¶ 3 & Att. 1 (Committee of Seventy forms) (Exh. G).

■  Ward 22, Division 11 -- Defendants' accessibility designation for the polling place for this division, located at Fire Engine # 9 at Germantown Avenue and Carpenter Lane, was "BL." *See Election Notice.* There were two steps at the entrance and no ramp in place. Johnson Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. H).

■  Ward 22, Division 25 -- Defendants' accessibility designation for the polling place for this division, located at the Stenton Train Station at Blakemore & Vernon Road, was "BL." *See Election Notice.* There was one step into the polling area and no ramp in place, making it inaccessible. Johnson Decl. ¶ 5 & Att. 3 (Committee of Seventy form).

■  Ward 22, Division 28 -- Defendants' accessibility designation for the polling place for this division, located at AB Day School at Crittendon & Johnson Streets, was "BL." *See Election Notice.* There were four steps to the entrance and no ramp in place, making it inaccessible. Johnson Decl. ¶ 6 & Att. 4 (Committee of Seventy form).

■  Ward 30, Division 13 -- Defendants' accessibility designation for the polling place for this division, located at 2040 Christian Street (Shiloh

Baptist Church), was "BN." *See Election Notice.* There were two steps at the entrance and no ramp in place. Resnick Decl. ¶ 10 & Att. 8 (photograph).

■ Ward 33, Division 4 -- Defendants' accessibility designation for the polling place for this division, located at the Holy Innocents Rectory at 4200 Glendale Street, was "RL." *See Election Notice.* There were multiple steps at the polling place and no ramp was in place or available, making it inaccessible. Parodi Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. I).[3]

■ Ward 33, Division 16 -- Defendants' accessibility designation for the polling place for this division, located at the Scanlon Recreation Center at J and Tioga Streets, was "BL." *See Election Notice.* There was one step at the entrance. Instead of a portable ramp, there was a makeshift ramp in the form of a piece of metal that could not have been used by someone using a motorized wheelchair. Parodi Decl. ¶ 4 & Att. 2 (Committee of Seventy forms).

■ Ward 34, Division 22 -- Defendants' accessibility designation for the polling place for this division, located in an auto garage office at 6542 Lebanon Avenue, was "BN." *See Election Notice.* There were three steps down to the entrance and no ramp. A voter who, due to a stroke-induced mobility disability, used a cane and could not walk steps, had to be carried down the steps to vote. Shilliday Decl. ¶¶ 4-5 & Att. 2 (Committee of Seventy form).

■ Ward 39, Division 4 -- Defendants' accessibility designation for the polling place for this division, located in a store at 2654 South Percy Street, was "BN." *See Election Notice.* There were two steps and no ramp in place, making it inaccessible. Resnick Decl. ¶ 11 & Att. 9 (photographs).

■ Ward 39, Division 5 -- Defendants' accessibility designation for the polling place for this division, located in a residence at 2000 South 4th Street, was "BN." *See Election Notice.* There was a step at the entrance

---

[3] The same Committee of Seventy volunteer surveyed this same polling place in the May 2007 primary election. At that time, the polling place had a ramp available but it was not in place. In the November 2007 general election, an election official told the volunteer that the City had not provided a ramp. Parodi Decl. ¶ 3. Given the number of steps, it is not clear that a portable ramp would be feasible to make this polling place accessible.

and no ramp was in place, making it inaccessible.  Kane Decl. ¶ 4 & Att. 1 (Committee of Seventy form) (Exh. J).

■   Ward 39, Division 42 -- Defendants' accessibility designation for the polling place for this division, located according to the Election Notice in the Jenks School Trailer at 13th and Porter Streets, was "BN."  *See Election Notice*. Divisions 31 and 43 in Ward 39 are located in the Jenks School (not the trailer) and are designated as "NN."  *See id.*  Prior to the last general election, a ramp was in place at the Jenks School Trailer that made the 42nd division independently usable by a person with a mobility disability.  During the November 6, 2007 general election, there was no ramp at the Jenks School Trailer where Division 42 was to be located and, in fact, all voting for the Division was relocated to the Jenks School, which was inaccessible.  Karen Comorato Decl. ¶¶ 3-4 (Exh. K).

■   Ward 41, Division 8 -- Defendants' accessibility designation for the polling place for this division, located at the office of the Roofers Local 30 at 6447 Torresdale Avenue, was "RL."  *See Election Notice.*  There was a portable ramp, but it was inside the polling place and not set up at the entrance and there was no signage to indicate that a ramp was available. Salandra Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. L).

■   Ward 41, Divisions 9 and 10 -- Defendants' accessibility designation for the polling place for these divisions, located in the Lawton School at 6101 Jackson Street, was "BL."  *See Election Notice.*  There was no accessible entrance. Salandra Decl. ¶ 4  & Att. 2 (Committee of Seventy forms).

■   Ward 41, Division 17 -- Defendants' accessibility designation for the polling place for this division, located in an office building at 4900 Longshore Avenue, was "BL." *See Election Notice.*  There was a portable ramp outside for the first step, but the second ramp was not in place for the second step to the entrance (though it was in the polling place).  Salandra Decl. ¶  5 & Att. 3 (Committee of Seventy form).

■   Ward 41, Division 19 -- Defendants' accessibility designation for the polling place for this division, located at the Church of the Good Shepherd, was "BL."  *See Election Notice.*  There were steps at both the front and side entrances, making the polling place inaccessible. Salandra Decl. ¶ 6 & Att. 4 (Committee of Seventy form).

- Ward 51, Divisions 21 and 25 -- Defendants' accessibility designation for the polling place for these divisions, located at a charter school at 1712 South 56th Street, was "RN."  *See Election Notice.*  A portable ramp was placed against a wall next to the step, but was not set up and in place for use by voters with mobility disabilities.  Resnick Decl. ¶ 13 & Att. 11 (photograph).

- Ward 59, Division 15 -- Defendants' accessibility designation for the polling place for this division, located at the First United Methodist Church at 6019 Germantown Avenue, was "FH."  *See Election Notice.*  The designated entrance was not accessible.  There was signage to an accessible side entrance, but the accessible entrance was locked.  The door to the accessible entrance was solid, so no one could see if a voter with a disability was at the door. Committee of Seventy volunteer surveyors rang the doorbell, but election officials did not answer.  The door was opened only because a teacher from the church (not affiliated with the election) saw the surveyors through her window and came to the door to see what they wanted.  Keister Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. M).

- Ward 61, Divisions 2, 3, 4, 7, and 8 -- Defendants' accessibility designation for the polling place for these divisions, located at the Lowell School at 5th Street and Nedro Avenue, was "BL."  *See Election Notice.*  Although there was an alternative, accessible entrance, there was no signage to indicate its availability.  When the accessible entrance was finally located, there were double doors and the interior door was locked.  No one answered the bell when Committee of Seventy volunteer surveyors rang it. Goldstein Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. N).

In addition, there were a number of polling places with accessible, alternative entrances that on the most recent Election Day, November 6, 2007, were not properly designated in the Election Notice as "AL" or "AN" (*i.e.*, indicating that the accessible entrance was not the main entrance), lacked proper signage, and/or were located at a distance from the accessible entrance, including the following:

- Ward 5, Division 22 -- Defendants' accessibility designation for the polling place for this division, located at the Casa Fermi Apartments at

1300 Lombard Street, was "BN." *See Election Notice*. There was an accessible, alternative entrance at the other end of the building, but there was no signage to indicate the availability or location of an accessible entrance nor were there any people at the front entrance who could advise an individual with a mobility disability about the location of the accessible entrance. Jones Decl. ¶ 3 & Att. 1 (Committee of Seventy form) (Exh. O).

■   Ward 22, Divisions 18 and 19 -- Defendants' accessibility designation for the polling places for these divisions, located at the Pleasant Recreation Center at Boyer Street and Pleasant Avenue, was "BL." *See Election Notice*. There were numerous (at least 15) steps at the entrance. There was no signage to indicate the availability of an alternative, accessible entrance. Although there was an alternative, accessible entrance, it was located around the block and would be quite difficult to locate. Johnson Decl. ¶ 4 & Att. 2 (Committee of Seventy form).

■   Ward 41, Divisions 6 and 7 -- Defendants' accessibility designation for the polling places for these divisions, located at the American Legion Recreation Center at Torresdale Avenue and Devereaux Street, was "FH." The main entrance was not accessible. There was a ramp at the back door, but there was no signage to indicate that an accessible alternative entrance existed. Salandra Decl. ¶ 7 & Att. 5 (Committee of Seventy forms).

■   Ward 41, Divisions 13 and 14 -- Defendants' accessibility designation for the polling place for these divisions, located at the Dorsey Recreation Center at Hellerman and Edmund Streets, was "BL." *See Election Notice*. There was an accessible entrance in the rear, but no signage to indicate that an accessible alternative entrance existed. Salandra Decl. ¶ 8 & Att. 6 (Committee of Seventy form).

■   Ward 51, Divisions 16 and 17 -- Defendants' accessibility designation for the polling place for these divisions, located at the New Testament Church at 935 South 53rd Street, was "BN." *See Election Notice*. There were two steps at the entrance. An alternative accessible entrance was located on another side of the building, but there was no signage to indicate that such an entrance existed. Resnick Decl. ¶ 12 & Att. 10 (photographs).

■   Ward 53, Division 18 -- Defendants' accessibility designation for the polling place for this division, located at the Harrington School at 53rd Street and Baltimore Avenue, was "BL." *See Election Notice*. There were multiple steps at the main entrance. There was an accessible side

10

entrance, but there was no signage to indicate that such an accessible alternative entrance existed.  Resnick Decl. ¶ 14 & Att. 12 (photographs).

There also were polling places designated in the Election Notice as inaccessible ("NL" or "NN") that either could be made accessible or could be relocated to nearby accessible alternative locations, including the following:

- ■  Ward 15, Division 12 -- Defendants' accessibility designation for this polling place, located in the New Macedonia Church at 867 North Corinthian Avene, was "NN."  *See Election Notice.*  The polling place has three steps at the entrances, but it is directly across from the Philadelphia Nursing Home, which is fully accessible, and near Girard College.  Smith Rep. at 21, 23 (Exh. P, Att. 1).

- ■  Ward 17, Division 24 -- Defendants' accessibility designation for this polling place, located in the Logan School at 17th Street and Lindley Avenue, was "NL."  *See Election Notice.*  There are two steps at the entrance and numerous steps inside.  However, there are two potential alternative sites owned by Pine Grove Baptist Church at 5019-21 Lindley Avenue that are generally accessible.  Smith Rep. at 25, 26.

- ■  Ward 30, Division 4 -- Defendants' accessibility designation for this polling place, located in an office at 901-B South 15th Street, was "NN." *See Election Notice.*  This polling place has a step less than 3 inches high at the door.  Although it would not be fully compliant with ADA Accessibility Guidelines due to the 31-inch door width, the facility could be made somewhat accessible by installing a portable ramp at the entrance.  Smith Rep. at 14.

- ■  Ward 39, Division 33 -- Defendants' accessibility designation for this polling place, located in a day care center at 2601 South 11th Street, was "NN."  *See Election Notice.*  The entrance has two steps.  A potential alternative accessible site is located at the D.N. Fell School at 900 Oregon Avenue, a mere two blocks away from the present polling place.  Smith Rep. at 17, 19.

For Pennsylvania voters with mobility disabilities who are assigned to an inaccessible polling place, the primary means by which they can vote is the alternative ballot process.  *See*

11

Pennsylvania Dep't of State, *The Alternative Ballot: Voting Accessibility for the Elderly and Handicapped Act*, *available at* www.dos.state.pa.us (Exh. Q); City of Philadelphia, *Absentee Ballots* at 2, *available at* http://www.philllyelection.com/abeng.htm. (Exh. R).  The alternative ballot process places burdens and intrusions upon individuals with mobility disabilities that are not imposed on non-disabled persons and that individuals with mobility disabilities would not have to endure if their assigned neighborhood polling places were physically accessible.

- ■ Individuals with disabilities must submit an application for an alternative ballot no later than 7 days prior to the election.  *Absentee Ballots* at 2 (Exh. R).  Individuals with mobility disabilities assigned by Defendants to inaccessible polling places must decide a week before the election whether they want to vote and lose the option to decide to vote based on events that occur in the week preceding the election.

- ■ Alternative ballots must be returned to the County Board of Elections no later than the close of polls at 8:00 p.m. on Election Day.  *Absentee Ballots* at 2 (Exh. R).  Ballots postmarked on Election Day will not be honored.  *Id.*  This means that the voter either (1) must vote in advance of Election Day to mail the alternative ballot so that it is received no later than Election Day, or (2) must arrange for transportation on Election Day to the Board of Elections at City Hall -- a far greater distance for most voters than their assigned neighborhood polling place.

- ■ Pennsylvania's Application for an Alternative Ballot requires the voter to check whether he is applying as an elderly or "handicapped" person. Pa. Dep't of State, *Pennsylvania Application for Alternative Ballot Under the Voting Accessibility for the Elderly and Handicapped Act*, *available at* http://www.dos.state.pa.us/ voting/lib/voting/03_alternativeballot/alternative_ ballot_application.pdf (Exh. S).  If the voter checks "handicapped," he must divulge the nature of his disability.  *Id.*  In Philadelphia, the voter can use the Absentee Ballot Application by checking "Illness or Physical Disability."  *See* City of Philadelphia, *Information Statement on Access to the Election Process for People with Disabilities in the City of Philadelphia* (hereafter "*Information Statement*") at 1, *available at* http://www.phillyelection. com/aceng.htm (Exh. T).  An individual who checks that box must divulge the nature of his physical illness or disability as well as the name, address, and phone number of his physician. *See Application for Absentee Ballot* (Exh. U); *see also* 25 Pa. Cons. Stat. Ann. § 3146.2(e)(2).  If the voter is physically unable to sign the declaration, then he must mark his form and have a

witness attest to that mark. *Application for Absentee Ballot*; *see also* 25 Pa. Cons. Stat. Ann. § 3146.2(e)(2).

- ■  Alternative ballots *cannot* be used by individuals with mobility disabilities if the Board of Elections has determined that their polling places are accessible even if, in fact, they are not accessible. *See Absentee Ballots* at 2 (Exh. R); Deposition of Robert Lee at 144-145 in *Nat'l Organization on Disability v. Tartaglione* (Exh. V). Accordingly, voters with mobility disabilities who are assigned to polling places that are incorrectly designated as accessible might not be able to use the alternative ballot process.[4]

There certainly may be some polling places that cannot reasonably be made accessible (either through temporary modifications or relocation) so that the burdensome alternative ballot would be the only feasible means for voting. There is, however, simply no legal justification to require the use of the alternative ballot process by voters with mobility disabilities who either: (1) are assigned to polling places that Defendants themselves have conceded can be and should be accessible on election days, or (2) are assigned to inaccessible polling places that can be made accessible through temporary modifications or relocation to accessible sites. Defendants' refusal

───────────────

[4]  It is unclear what constitutes an inaccessible polling place for purposes of determining a voter's eligibility to use an alternative ballot. Pennsylvania's Application for Alternative Ballot requires the voter to *certify* that he has "been assigned to a polling place that the County Board of Elections has determined to be inaccessible to the elderly and individuals under standards prescribed by the Secretary of the Commonwealth." *Pennsylvania Application for Alternative Ballot* (Exh. S). It is unclear how a voter would know whether his inaccessible polling place that was designated in the Election Notice as fully accessible (FH), substantially accessible (BL, RL, BN, RN), or accessible by alternative entrance (AL, AN) constitutes an "inaccessible" polling place to qualify for an alternative ballot. Defendants' materials are equally confusing. The Election Notice refers to individuals who "are voting by means of an alternative ballot because of inaccessibility of their polling places" without denoting which of the accessibility designations would qualify as "inaccessible" for purposes of voting by alternative ballot. *Election Notice* (Exh. A). Although some information on Defendants' website suggests that the ineligibility for alternative ballots applies only to voters assigned to polling places designated as "FH" (*i.e.*, fully accessible), *see Information Statement* at 1 (Exh. T), it is not clear how a voter without access to this web-based material would know this.

13

to maximize the accessibility of their polling places -- especially their inexplicable failure to assure that polling places they designate as "accessible" are in fact accessible -- violates the Americans with Disabilities Act and the Rehabilitation Act.

## ARGUMENT

### I.  PERMANENT INJUNCTIVE RELIEF IS WARRANTED TO REMEDY DEFENDANTS' CONTINUED VIOLATIONS OF THE ADA AND RA.

#### A.  Standard for Permanent Injunction

The issuance of a permanent injunction is appropriate if: "(1) the exercise of jurisdiction is appropriate; (2) the moving party has actually succeeded on the merits of its claim; and (3) the 'balance of equities' favors granting injunctive relief." *Chao v. Rothermel*, 327 F.3d 223, 228 (3d Cir. 2003); *accord Texas Eastern Transmission LP v. Bowers*, Civil Action No. 01-4488, 2002 WL 77409 at *2 (E.D. Pa. Jan. 17, 2002) (Padova, J.), *aff'd*, 65 Fed. Appx. 794 (3d Cir. 2003).  Each of these elements is satisfied in this case, justifying permanent injunctive relief.

#### B.  The Court's Exercise of Equity Jurisdiction is Appropriate.

"Equity jurisdiction is proper if:  (1) the plaintiff has no adequate remedy at law; (2) the threatened injury is real, not imagined; and (3) no equitable defenses preclude jurisdiction." *Texas Eastern Transmission LP v. Bowers*, 2002 WL 77409 at *2, *4.  Plaintiffs here have no adequate remedy at law.  Only an injunction that allows voters with mobility disabilities to participate in the voting process in the same manner as their neighbors will provide them with appropriate relief.  Further, the injury is quite real.  As the evidence set forth above shows, Defendants have failed to assure that polling places that -- in their own representations -- should be accessible are, in fact, accessible when it matters on election day.  Defendants also have failed

14

to take reasonable steps to make inaccessible polling places accessible.  As a result, individuals with mobility disabilities (particularly, those who use wheelchairs) are unable to participate in the voting process in the same manner as their friends and neighbors.  Defendants have asserted no valid equitable defenses.[5]

### C.  Plaintiffs Have Succeeded on the Merits of Their Claims.

#### 1.  Overview of the ADA and RA

Section 504 of the Rehabilitation Act (RA) is "commonly known as the civil rights bill of the disabled," *Americans Disabled for Accessible Public Transportation (ADAPT) v. Skinner*, 881 F.2d 1184, 1187 (3d Cir. 1989) (en banc), and prohibits disability-based discrimination by federal funding recipients, such as Defendants.  29 U.S.C. § 794(a).[6]   Recognizing certain limitations of Section 504, Congress enacted the Americans with Disabilities Act (ADA) in 1990 to prohibit discrimination by all public entities, regardless of whether they receive federal funding.  H.R. Rep. No. 101-485, pt. 3, at 49 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 472.

---

[5] Defendants contended in their Motion to Dismiss that Plaintiffs' claims are barred by the second Settlement Agreement in *National Organization on Disability v. Tartaglione*, Civil Action No. 01-1923 (E.D. Pa.).  *See* Defs.' Mem. in Support of its Motion to Dismiss at 15-16.  As detailed in Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, this contention is doubly flawed.  First, Plaintiffs and class members in this case simply were not parties to that litigation.  They were not and could not be members of the certified class in that case and, accordingly, they are not bound by any settlement of that case.  Second, the scope of the release in the second Settlement Agreement would not even bar parties to that Agreement from raising these claims.  *See* Pls.' Mem. in Opp. to Defs.' Motion to Dismiss at 25-28.

[6] Defendants received federal funds in Fiscal Years 2005 and 2006 and were expected to receive federal funding in Fiscal Year 2007. *See City of Philadelphia Fiscal 2007 Operating Budget as Adopted by City Council* (May 25, 2006) (excerpt showing federal funding for City Commissioners) (Exh. W); *City of Philadelphia Fiscal 2006 Operating Budget as Adopted by City Council* (June 2, 2005) (excerpt showing federal funding for City Commissioners) (Exh. X).

15

Like Section 504 of the RA, Title II of the ADA broadly prohibits discrimination by public entities, such as Defendants.  42 U.S.C. §§ 12131(1), 12132.

The RA and ADA reflect Congress's recognition of the pervasiveness of disability-based discrimination in society.  Congress specifically found that persons with disabilities "continually encounter various forms of discrimination in such critical areas as ... *voting* ...."  29 U.S.C. § 701(a)(5) (RA) (emphasis added); 42 U.S.C. § 12101(a)(3) (ADA) (emphasis added).

Given the unique and diffuse nature of disability-based discrimination, the Supreme Court concluded that "much of the conduct that Congress sought to alter in passing the Rehabilitation Act ... would be difficult if not impossible to reach were the Act construed to proscribe only conduct fueled by a discriminatory intent."  *Alexander v. Choate*, 469 U.S. 287, 296-97 (1985).  Accordingly, the concept of "discrimination" under the RA and ADA encompasses more than disparate treatment of people with disabilities vis-à-vis non-disabled individuals.  *See Olmstead v. L.C.*, 527 U.S. 581, 598 (1999) (ADA); *Alexander v. Choate*, 469 U.S. at 297, 300-01 (RA); *Helen L. v. DiDario*, 46 F.3d 325, 333, 335 (3d Cir.), *cert. denied*, 516 U.S. 813 (1995) (ADA); *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1384 (3d Cir. 1991) (RA).  The RA and ADA also prohibit actions by covered entities that have a discriminatory effect on people with disabilities.  *See Alexander v. Choate*, 469 U.S. at 297 (RA); *Frederick L. v. Dep't of Public Welfare*, 157 F. Supp. 2d 509, 539 (E.D. Pa. 2001) (ADA).  Additionally, these statutes affirmatively require that covered entities make reasonable modifications to their policies and practices when necessary to accommodate individuals with disabilities, *see Olmstead v. L.C.*, 527 U.S. at  592 (ADA); *Alexander v. Choate*, 469 U.S. at 301 (RA), and assure that people with

16

disabilities have "meaningful access" to covered entities' programs. *Alexander v. Choate*, 469 U.S. at 301 (RA); *Chaffin v. Kansas State Fair Bd.*, 348 F.3d 850, 857 (10th Cir. 2003) (ADA).

In addition to the case law, the contours of the broad anti-discrimination mandates of the ADA and RA have been delineated by regulations promulgated by the Department of Justice (DOJ).  The Supreme Court has recognized that DOJ's "coordination regulations," 28 C.F.R. Pt. 41, initially promulgated pursuant to an Executive Order by the Department of Health, Education and Welfare, *see Helen L. v. DiDario*, 46 F.3d at 330, properly implement Section 504 of the RA and are entitled to deference.  *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 634 (1984). The Third Circuit has held that DOJ's regulations promulgated under Title II of the ADA, 28 C.F.R. Pt. 35, pursuant to specific congressional direction, 42 U.S.C. § 12134, have the "force of law." *Helen L. v. DiDario*, 46 F.3d at 332-33.

### 2.  Defendants' Failure to Assure that Its Polling Places Are Accessible on Election Day When It Is Reasonable to Make Them Accessible Violates the ADA and the RA.

Defendants' actions and inactions in this case violate the ADA and RA in several overlapping, yet distinct, respects.  Each constitutes an independent basis to establish liability.

### (a)  Defendants Violate the ADA and RA by Excluding Individuals with Mobility Disabilities from the Voting Process.

DOJ has issued a detailed checklist that details accessibility standards for polling places. DOJ, *ADA Checklist for Polling Places* (Feb. 2004), *available at* http://www.usdoj.gov/ crt/ada/votingck.htm.  The evidence establishes that Defendants failed to comply with even the most basic requirements concerning entrances to polling places established by DOJ.  Indeed, Defendants failed even to comply with their own accessibility standards.

17

Defendants designated numerous polling places as accessible (either fully, substantially, or through an alternative entrance) that, in fact, were not accessible on Election Day based on Defendants' own criteria as well as the criteria established by DOJ. Certain polling places that Defendants designated as having substantially accessible main entrances ("BL," "BN," "RL," or "RN") in fact neither had accessible main entrances nor accessible alternative entrances. *See*, discussion, *supra*, at 4-9. In other words, the polling places were completely inaccessible to voters with mobility impairments contrary to Defendants' own conclusions that such polling places can and should be made accessible. The ADA requires that polling place entrances must have at least one accessible entrance. *ADA Checklist for Polling Places* at 19.[7] Other polling places did have accessible alternative entrances, but they were improperly designated by Defendants as "FH," "BL," or "BN," rather than "AL" or "AN." *See* discussion, *supra*, at 9-11. More importantly, many of these polling places with accessible, alternative entrances violated DOJ's accessibility standards because they lacked appropriate signage at the main entrance to direct voters to the accessible entrances and/or because they were locked, *see* discussion, *supra*, at 9-11, and DOJ mandates that such alternative entrances "must remain open when the polling place is open." *ADA Checklist for Polling Places* at 19, 22. Aside from the inaccessibility of polling places that Defendants themselves had designated as "accessible," Plaintiffs have

---

[7] Polling places designated by "BL," "BN," "RL," or "RN" meant, according to Defendants' Election Notice, that the polling places were "substantially accessible ... with minor assistance." This could mean that the entrances could be accessed through temporary ramps, which would be consistent with DOJ's standards. *See ADA Checklist for Polling Places* at 22 (allowing temporary ramps for one or two steps at the entrance). If, on the other hand, "minor assistance" means carrying voters, such an alternative would violate the ADA.

18

established that there were polling places designated as inaccessible that could be made accessible by relocating them. *See* discussion, *supra*, at 11.

By failing to assure the accessibility of their polling places -- including those that they affirmatively stated would in fact be accessible to and usable by voters with mobility disabilities on Election Day -- Defendants discriminated against such individuals in violation of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(a), and the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(a). Specifically, the inaccessibility of these polling places excluded voters with mobility disabilities from participation in and denied them the benefits of Defendants' services, programs, and activities by precluding such individuals from using their local polling places established by Defendants where they could vote with their neighbors, meet election judges and party officials, and gain information from the candidates' representatives. Moreover, the inaccessibility of polling places that had been designated by Defendants' as accessible precluded them from timely seeking an alternative ballot since only voters assigned to inaccessible polling places could seek such a ballot and they were required to do so one week prior to Election Day. *See* discussion, *supra*, at 13.[8]

---

[8] A voter with a mobility disability who, upon arriving at his polling place, finds that it is inaccessible can file an application for an emergency alternative ballot at the County Board of Elections by 8:00 p.m. on Election Day. *See The Alternative Ballot: Voting Accessibility for the Elderly and Handicapped Act* (Exh. Q). This requires the voter: (1) to secure and complete an Emergency Application after discovering the inaccessibility of the polling place; and (2) deliver it to the County Board of Elections in City Hall by the close of polls on Election Day either in person or via an agent designated by the voter using Pennsylvania's forms. *See id.* This is certainly not a feasible solution for most voters with mobility disabilities faced on Election Day with an inaccessible polling place. Such voters are unlikely to be aware of this option. Even if they are aware of it, they would have to make last minute arrangements to travel to City Hall (and transportation for many with mobility disabilities is difficult) or find someone who could get them an alternative ballot and agent designation forms and travel to City Hall on their behalf.

**(b)  Defendants Violate the ADA and RA by Failing to Afford Individuals
with Mobility Disabilities Equal Opportunity to Participate in the Voting Process.**

Defendants violate the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(1), and the

RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(1)), by denying or failing to afford individuals

with mobility disabilities the opportunity to participate in and benefit from Defendants' services,

programs and activities.  As described above, Defendants' have failed to assure that all polling

places that could be accessible are, in fact, accessible.  The inaccessibility of neighborhood

polling places deprives individuals with mobility disabilities of equal opportunity to participate

in the voting process.  Unlike non-disabled voters, voters with mobility disabilities cannot vote

at their local polling places with their friends and neighbors on Election Day where they can

meet the local election judges and party officials and gain access to information from the

candidates' representatives.   To vote, individuals with mobility disabilities must request

alternative ballots at least one week in advance (and, in doing so, disclose private information

on the nature of their disabilities) and then they must either cast their ballots in advance of

Election Day or somehow arrange for transportation to City Hall to deliver their ballots on

Election Day.  Alternative ballots, therefore, do not afford individuals with mobility disabilities

equal opportunity to participate in Defendants' voting process.

Indeed, Defendants' mistaken designation of many inaccessible sites as accessible

exacerbates the lack of equal opportunity for two reasons.  First, many individuals with mobility

disabilities might not know until they arrive that their polling places are inaccessible, which

could be too late to secure an alternative ballot.  Second, only individuals assigned to inacces-

sible polling places can vote by alternative ballot, so that individuals who are assigned to polling

20

places incorrectly designated as accessible might not be able to use the alternative ballot process at all.

### (c)  Defendants Violate the ADA and RA through Discriminatory Site Selection.

Defendants violate the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(4), and the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(4), by selecting inaccessible polling places, which exclude individuals with mobility disabilities from the voting process that is available to and used by non-disabled voters and that substantially impair the accomplishment of Defendants' objectives to enable Philadelphia voters to vote in their neighborhoods on Election Day.  In *National Organization on Disability v. Tartaglione*, Civil Action No. 01-1923, 2001 WL 1231717 (E.D. Pa. Oct. 11, 2001), this Court specifically held that allegations that these Defendants selected inaccessible polling places -- "depriving mobility impaired voters of the benefit of voting in their neighborhood polling places in the same manner as non-disabled voters" -- gave rise to an actionable claim under the ADA.  *Id.* at *7.

Defendants have continued to select inaccessible sites, even though they either could make those sites accessible through temporary alterations or they could choose alternative, accessible sites.  *See* discussion, *supra*, at 4-9, 11.  Indeed, in one instance in Ward 39, Division 42, Defendants moved a site from an accessible site to an inaccessible site.  *See* discussion, *supra*, at 8.  Defendants' continued selection of inaccessible sites thus violates the ADA and RA.

21

**(d)  Defendants Violate the ADA and RA by
Using Discriminatory Methods of Administration.**

The ADA and RA prohibit Defendants from using methods of administration that have the effect of subjecting individuals with mobility disabilities to discrimination on the basis of their disabilities or that defeat or substantially impair the accomplishment of Defendants' programs' objectives. 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3) (ADA); 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(3) (RA).  Defendants have violated the prohibition against discriminatory methods of administration in several distinct ways.

First, the Election Notice published by Defendants contains confusing and misleading information.  The Election Notice is confusing because it uses "BL," "RL," "BN," and "RN" to denote polling places that are "substantially accessible ... with minor assistance" without stating what, if any, assistance is needed.  The Election Notice is not only confusing, but it actively misleads voters by (1) suggesting that polling places may be accessible in some form even when, as detailed above, they are not, and (2) not using the "AL" or "AN" designation for those polling places accessible by alternative entrances so that, combined with the lack of signage in those polling places, voters will not know about the availability of an alternative entrance. Defendants' publication of a misleading and confusing Election Notice substantially impairs the accomplishment of their objective to facilitate the ability of Philadelphians to vote in their local polling places with respect to voters with mobility disabilities in several ways:  (1) by causing people with mobility disabilities to believe that their local polling places are accessible when, in fact, they are not so that they do not timely seek an alternative ballot and they cannot vote in their local polling places; or, alternatively, (2) by causing voters with mobility disabilities to

22

conclude that they cannot vote in their local polling places independently (due to the vagueness of the "minor assistance" language) when, in fact, those polling places may be accessible and independently usable by such voters.

Second, Defendants took no steps to assure that polling places that they claimed should and would be made accessible on Election Day in fact were accessible on Election Day. Temporary ramps were not provided or, if provided, were not put in place so that they could be used. Other polling places lacked signage to inform voters with mobility disabilities of accessible entrances and, in some instances, the accessible entrances were locked and doorbells went unanswered by election officials. These methods of administration again substantially impaired the accomplishment of Defendants' objective to facilitate the ability of Philadelphians to vote in their local polling places with respect to voters with mobility disabilities and not to timely seek alternative ballots.

Third, Defendants have refused to relocate inaccessible polling places to accessible locations in the same or adjacent divisions when it is feasible to do so. Plaintiffs have provided examples of inaccessible polling places that could be relocated, but, they remain in inaccessible locations. Defendants' failure to act to relocate these and other inaccessible polling places that could be relocated substantially impairs the accomplishment of Defendants' objective to facilitate the ability of Philadelphians to vote in their local polling places with respect to voters with mobility disabilities.

### (e)  Defendants Violate the ADA and RA by Failing to Make Reasonable Modifications in their Policies, Practices, and Procedures.

It is well established that the ADA and RA require Defendants to make reasonable modifications to their policies, practices, and procedures to avoid discrimination.  *See* 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7) (ADA); *Alexander v. Choate*, 469 U.S. at 301 (RA). Defendants violate the ADA and RA by failing to make reasonable modifications in their policies, practices, and procedures to avoid discrimination against voters with mobility disabilities.

Defendants have incorrectly designated a number of polling places as accessible.  Most of these polling places can be accessible and should be accessible on Election Day.  It merely requires that Defendants assure, for example, that temporary ramps are in fact both provided to the polling place and set up to be used by voters with mobility disabilities during polling hours; that appropriate signage is actually posted in locations to alert voters with mobility disabilities where those alternative accessible entrances can be found when the main entrances are inaccessible; and that alternative, accessible entrances are unlocked during voting hours so that persons with mobility disabilities can freely and independently and without assistance access the polling place like non-disabled voters.  Yet, Defendants have failed to take the reasonable steps necessary to assure that these minor modifications -- modifications that they effectively agreed to make -- are in place on Election Day to enable individuals with mobility disabilities to vote

24

in the same way as their friends and neighbors.  By failing to take such reasonable steps,

Defendants violate the ADA and RA.[9]

### (f)  Defendants Violate the ADA and RA by Failing to Provide Services in the Most Integrated Settings.

The Supreme Court and Third Circuit have acknowledged that states have an obligation

under the ADA to provide services for persons with disabilities in the most integrated setting

appropriate to their needs.  *See Olmstead v. L.C.*, 527 U.S. at 600-01; *Helen L. v. DiDario*, 46

F.3d 325, 334-35; *see also* 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(d) (ADA); 29 U.S.C. §

794 and 28 C.F.R. § 41.51(d) (RA).  Accessible polling places are the most integrated setting in

which individuals with disabilities can vote since it offers them the opportunity to vote with their

non-disabled neighbors and have access to election officials and ward leaders in the same way

as their non-disabled neighbors.  In contrast, voting by alternative ballot is done in isolation in

advance of election day.  It is a completely segregated process.

Defendants force many voters with mobility disabilities to use the segregated alternative

ballot process (or not to vote) because it has failed to assure that its polling places are accessible

when it is reasonable to do so.  Indeed, as detailed above, Defendants have failed even to assure

that polling places that they concede should be accessible are, in fact, accessible on Election

Day.  Defendants thus violate the ADA's and RA's integration mandates by failing to administer

their services, programs and activities in the most integrated setting appropriate to the needs of

---

[9]  Another reasonable modification is to assure that the Election Notice published in newspapers prior to Election Day is clear and accurate concerning accessibility of polling places. Polling places that are inaccessible should not be designated as accessible.  Polling places that have alternative, accessible entrances should be denoted as "AL" or "AN" and not some other accessibility designation.

the individual.  *Cf. Lovely H. v. Eggleston*, 235 F.R.D. 248, 261 (S.D.N.Y. 2006) (holding that assignment of beneficiaries with disabilities to segregated services "violates the mandate that persons with disabilities be given the opportunity to participate in mainstream service delivery mechanisms").

### (g)  Defendants Violate the ADA and RA by Failing to Assure Program Access.

#### (1)  Defendants Have Failed to Assure the Accessibility of Each Polling Place that Could Reasonably Be Made Accessible, Including Those That They Have Designated As Accessible.

The Supreme Court has recognized that the removal of architectural barriers is necessary to rectify the harms resulting from the effects of discrimination.  *Alexander v. Choate*, 469 U.S. at 297.   The Third Circuit, too,  has acknowledged that one "goal of the ADA" is "the elimination of architectural barriers that presently preclude those with disabilities from *full and equal* participation in society."  *Kinney v. Yerusalim*, 9 F.3d 1067, 1072 n.5 (3d Cir. 1993) (emphasis added), *cert. denied*, 511 U.S. 1033 (1994); *accord* 42 U.S.C. § 12101(a)(5) ("individuals with disabilities continually encounter discrimination, including ... the discriminatory effects of architectural ... barriers ....").  For existing facilities, the ADA and RA require "program accessibility."  42 U.S.C. § 12132 and 28 C.F.R. § 35.150 (ADA); 29 U.S.C. § 794 and 28 C.F.R. § 41.57 (RA).  Program accessibility mandates that public entities assure that each program or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.  28 C.F.R. §§ 35.150, 41.57.

Each polling place is a unique program because registered voters are required to vote only in their assigned polling place and cannot select an alternative, accessible polling place.  As such,

26

each polling place must be accessible unless Defendants can show that doing so would result in a fundamental alteration or undue burden.   *See* 28 C.F.R. §§ 35.150(c).

In this case, Plaintiffs have presented representative evidence that there are a number of polling places that can feasibly be made accessible in accordance with DOJ's *ADA Checklist for Polling Places*.[10]   *See* discussion, *supra*, at 4-11.   Indeed, many of these are polling places that Defendants themselves have determined can and should be accessible.   Others are polling places that Defendants have designated as inaccessible, but that could readily be made accessible by, for example, relocation to other accessible sites within the same division or an adjacent division.[11]   Defendants' failure to assure that each polling place is accessible if it can be made accessible (either through modifications or relocation to alternative accessible sites) thus violates the ADA's and RA's program access mandates.

### (2)   Defendants Cannot Avoid Liability on Plaintiffs' Program Access Claim Either By Asserting that the "Program" Is All Polling Places or By Relying on the Alternative Ballot Process.

Defendants have argued that they comply with the program access mandates of the ADA and RA because their "program" consists of *all* Philadelphia polling places and, since *some* of their polling places are accessible, their program is accessible "when viewed in its entirety" as

---

[10]   Defendants have the burden to demonstrate that it would be an undue burden or fundamental alteration to make inaccessible polling places accessible through temporary modifications or relocation to accessible locations in the same or adjacent divisions.   *See US Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002); *Frederick L. v. Dep't of Public Welfare*, 364 F.3d at 492 n.4; *Juvelis ex rel. Juvelis v. Dep't of Public Welfare*, 68 F.3d 648, 653 & n.5 (3d Cir. 1995); 28 C.F.R. § 35.150(c).

[11]   For example, Ward 15, Division 12, which is located in an inaccessible church, is directly across from an accessible nursing home and near other accessible locations, including the Philadelphia Nursing Home and Girard College.   *See* discussion, *supra*, at 11.

required by the program access mandates.  Defendants' characterization of the program is simply

incorrect.[12]  Each voter in Philadelphia is permitted to vote only in her assigned polling place;

she does not have the option of voting in an alternative, accessible location.  Thus, each polling

place constitutes a unique program and each must be accessible.

DOJ's Technical Assistance Manual offers useful guidance, providing several examples

of how the ADA's program accessibility mandate works, including the following:

> ILLUSTRATION 2:   D, a defendant in a civil suit, has a
> respiratory condition that prevents her from climbing steps.  Civil
> suits are routinely heard in a courtroom on the second floor of the
> courthouse.  The courthouse has no elevator or other means of
> access to the second floor.  The public entity must relocate the
> proceedings to an accessible ground floor courtroom or take
> alternative steps, including moving the program to another
> building, in order to allow D to participate in the civil suit.

> ILLUSTRATION 3:  A State provides ten rest areas approximately
> 50 miles apart along an interstate highway.  Program accessibility
> requires that an accessible toilet room for each sex with at least one
> accessible stall, or a unisex bathroom, be provided at each rest
> area.

DOJ, *ADA Title II Technical Assistance Manual* § II-5.1000 (1993), *available at*

http://www.ada.gov/taman2.html.

In Illustration 2, the "program" is not the right to pursue or defend civil actions generally.

Thus, it is not enough that the litigant's counsel could attend the proceedings or that the court

would accept the litigant's deposition testimony in lieu of in-person attendance.  Rather, the

---

[12]  Moreover, Defendants' argument that their program is accessible when viewed in its entirety applies only to Plaintiffs' program access claim and does not address Plaintiffs' other, independent claims under the ADA and RA that are discussed above.

"program" encompasses the right to fully participate in the process. Since the litigant could not participate in his case in an inaccessible location, he was excluded from the program "when viewed in its entirety." Similarly, the "program" in the instant case is not merely the opportunity to cast a ballot. The program is the voting process that takes place at each voter's assigned, neighborhood polling location where she can vote with friends and neighbors on Election Day, meet and speak with neighborhood election judges and party officials, and receive information about the candidates like her non-disabled neighbors.

Illustration 3 provides an even more apt analogy. In that case, DOJ opined that *all* highway rest areas must be made accessible to satisfy the ADA's program accessibility mandate. Given the distance between rest areas, each rest area must be considered to be a discrete program since many drivers will not be driving through the entire highway system to reach the accessible rest area. If fewer than all the rest stops are accessible, drivers will be subject to a *de facto* denial of access to the program. This case presents an even more egregious situation. This is not a matter merely of a voter having to travel to an accessible polling place at some distance since the voter is wholly precluded from choosing an alternative, accessible polling place.

Defendants also cannot rely on the alternative ballot process to satisfy their program access obligation. Although "non-structural" options may sometimes be considered in determining whether there has been compliance with the program access mandate, 28 C.F.R. § 35.150(b), DOJ has stressed that such non-structural options may not always be sufficient to comply with the ADA and that, in some cases, only physical access will satisfy the mandate. "When choosing a method of providing program access, a public entity must give priority to the

29

one that results in the most integrated setting appropriate to encourage interaction among all users, including individuals with disabilities." *ADA Title II Technical Assistance Manual* § II-5.2000.  Thus, if there is only one facility that provides the service and it can be made accessible, public entities should give priority to making the facility accessible rather than using alternative methods.  *Id.*  More importantly, non-structural access to the program cannot satisfy the program accessibility mandate unless the non-structural alternative is truly equivalent to physical access to the program facilities.  For example, DOJ notes that a public university can provide program access by retrieving books from upper floors in a building that has no elevators so long as the assistance is provided during the operating hours of the library.  *Id.* (Illustration 2).  In other words, the patrons with mobility disabilities must have access to the same books at the same time and at the same facility as non-disabled patrons.

A technical assistance letter from DOJ provides more specific guidance relating to acceptable, non-structural alternatives to requiring that public entities make all polling places physically accessible.   DOJ, *Letter to Judy Steelman* (Aug. 3, 1993), *available at* http://www.usdoj.gov/crt/foia/ltr216.htm (Exh. Y).  Arkansas had inquired whether, in lieu of making all of its polling places accessible, it could satisfy the ADA by reassigning voters to accessible polling places if they requested a reassignment 30 days in advance.  DOJ advised that the ADA's program accessibility mandate allows alternatives to accessible polling places only if the alternatives are "*effective* in providing a person with a disability the equal opportunity to cast a ballot on the day of the election."  *Id.* (emphasis in original).  Given that standard, DOJ indicated that "requiring a person with a disability to travel [to a reassigned polling place] approximately

the same distance as a person who is not disabled in a particular voting area would meet the requirements of title II; however, requiring a person with a disability to travel significantly more than a person who is not disabled would not meet the requirements of title II." *Id.*  While reassignment, as a concept, might be feasible, DOJ rejected the state's advance notice requirement:  "An advance notice requirement cannot be enforced to prevent him or her from casting a ballot." *Id.*

In light of DOJ's guidance in its Technical Assistance Manual and letter, the Court cannot conclude that the alternative ballot process is an *effective* alternative to polling place accessibility to assure that voters with mobility disabilities have access to the voting process.  To the contrary, the facts demonstrate that the alternative ballot process does not afford voters with mobility disabilities access to the voting process that is as effective as accessible polling places.

- The alternative ballot process requires voters with mobility disabilities to submit applications for alternative ballots one week in advance of Election Day.  DOJ indicated in its technical assistance letter to Arkansas that an advance notice requirement to make use of the alternative voting process would violate the ADA's program access mandate.

- The alternative ballot process requires voters with mobility disabilities to disclose the private nature of their disabilities and to identify their physicians while other voters can vote without disclosure of private health care information.

- The alternative ballot process requires voters with mobility disabilities either to vote in advance of Election Day or to make travel arrangements to City Hall to submit their ballot on Election Day.  Voting in advance of Election Day is not equivalent to polling place accessibility that allows voters to vote on Election Day.  Requiring voters to travel to City Hall (when non-disabled voters must only travel a few blocks) is not effective.  As DOJ opined in its technical assistance letter to Arkansas, an effective, non-structural program access method would not require voters with disabilities "to travel significantly more than a person who is not disabled."

■　　The alternative ballot process may not even provide an available, much less effective, alternative for those voters with mobility disabilities who are assigned to inaccessible polling places that the Defendants have designated as accessible.

■　　The alternative ballot process results in segregated voting.　Voters with disabilities vote in isolation.　DOJ has indicated that a segregated alternative is not an appropriate method for providing program access.　*ADA Title II Technical Assistance Manual* § II-5.2000.

DOJ's construction accords with this Court's analysis in *National Organization on Disability v. Tartaglione*, 2001 WL 1231717 at *3-*7.　In denying the motion to dismiss a challenge by voters with mobility disabilities to the City's failure to provide accessible polling places, the Court acknowledged the plaintiffs' allegations that the alternative ballot process "is substantially different from, more burdensome than, and more intrusive than the voting process used by non-disabled voters" and that "Defendants have had the opportunity to alleviate these barriers by ... choosing polling places which would be accessible to persons with mobility impairments." *Id.* at *3.[13]

---

[13]　*NAACP v. Philadelphia Bd. of Elections*, Civil Action No. 97-7085, 1998 WL 321253 (E.D. Pa. June 16, 1998), is not at odds with this Court's decision in *National Organization on Disability v. Tartaglione*.　Concerned that the alternative ballot process created an opportunity for fraud, the plaintiff in *NAACP* sought to prevent use of alternative ballots in non-federal elections on the basis that the Voting Accessibility for the Elderly and Handicapped (VAEH) Act, 42 U.S.C. § 1973ee-1 *et seq.*, permitted the use of alternative ballots only in federal elections.　The question, according to the court, was simply whether the use of alternative ballots in non-federal elections is prohibited by law.　*Id.* at *2.　In answering the question in the negative, the court noted that the ADA required defendants to make accommodations for voters in all elections and concluded: "The VAEH procedures are *a* reasonable modification under the ADA ...." *Id.* at *5 (emphasis added).　As this Court recognized in *National Organization on Disability v. Tartaglione*, 2001 WL 1231717 at *3, *NAACP* is not controlling because the court in that case was not asked to -- and did not -- address the question raised in this case, *i.e.*, whether the ADA requires Defendants to take steps other than the alternative ballot process to avoid discrimination and provide equal access to the voting process.

Furthermore, Defendants cannot assert that the availability of the alternative ballot process is a defense to Plaintiffs' program access claim to the extent that Plaintiffs challenge Defendants' failure to assure the accessibility of those polling places that they concede can be and should be accessible in fact are accessible on Election Day.   Acting in accordance with Congress's direction in Title II of the ADA, 42 U.S.C. § 12134, DOJ promulgated regulations governing accessibility of public entities' facilities and services.   28 C.F.R. §§ 35.149-35.151. While DOJ required that public entities assure that all new facilities and all existing facilities that are altered must be accessible, it only mandated "program access" for existing facilities.  *See id.*; 28 C.F.R. Pt. 35, App. § 35.150; *Kinney v. Yerusalim*, 812 F. Supp. 547, 548 (E.D. Pa.), *aff'd*, 9 F.3d 1067, 1073 & n.6 (3d Cir. 1993), *cert. denied*, 511 U.S. 1033 (1994).  This scheme serves "ultimately to create a society providing physical accessibility to persons with disabilities" by assuring that, over time as new facilities are built or existing ones are altered, they are made in a manner that is accessible to and usable by people with mobility disabilities.  *See Kinney*, 812 F. Supp. at 548.

The program access standard thus assured that public entities would not have to undertake costly retrofitting of all of their facilities to make them immediately accessible when the ADA became effective as long as the program as a whole is accessible.  The program access standard, however, surely cannot excuse public entities who choose to *decrease* the amount of accessibility on the basis that the program as a whole is accessible.  For example, if a public school district had four elementary schools when the ADA became effective and two were accessible, it would meet the program access requirements even though children with mobility disabilities who live

33

in neighborhoods served by the inaccessible schools would have to be transported to the accessible schools.  Program access would not require the school district to make the two inaccessible facilities accessible unless and until the district decided to alter them.  The school district, though, cannot make one of the accessible schools inaccessible (*e.g.*, removing the ramp because skateboarders are using it) and contend that it satisfies the ADA because all children with mobility disabilities can travel to the one remaining accessible school.  So, too, the school district could not make both of the accessible schools inaccessible and defend against an ADA challenge by asserting that it will offer home schooling to the youngsters with disabilities.

*Lovely H. v. Eggleston* is analogous.  In that case, the court enjoined the defendants' reassignment of people with disabilities from neighborhood centers for benefits to centers that serve primarily people with disabilities.  The court explained that the defendants' actions "turn back the clock not only for the individual who is denied access to the neighborhood center that welcomes his able-bodied neighbors, but also for a society that has made tremendous efforts and strides to improve, rather than constrict, accessibility for and integration of the disabled into all aspects of mainstream life."  235 F.R.D. at 262.

Defendants have publicly stated that there are a great many polling places that can be and will be made accessible so that voters with mobility disabilities can vote in their own neighborhoods on Election Day.  Yet, some of these polling places, in fact, are not accessible on Election Day.  In effect, Defendants have *decreased* access that existed.  It would be wholly at odds with the ADA's goal of *expanding* access over time to allow Defendants to contend that

34

it can decrease polling place accessibility because the alternative ballot process is sufficient to provide program access.

### D.   **The Balance of Equities Weighs Heavily in Favor of Injunctive Relief.**

Defendants' continued failure to maximize the accessibility of neighborhood polling places -- including their failure to assure the accessibility on Election Day of polling places that they concede should be accessible -- significantly harms individuals with mobility disabilities, particularly those who use wheelchairs.[14]   "The anti-segregation laws upon which Plaintiffs rely reflect important public policy commitments to equality and access."  *Lovely H. v. Eggleston*, 235 F.R.D. at 262.   Discrimination stemming from lack of equal access constitutes irreparable harm.  *See Layton v. Elder*, 143 F.3d 469, 472 (8th Cir. 1998) (lack of access to courthouse for person with mobility disability creates irreparable harm).   So, too, "[i]njuries to individual dignity and deprivations of civil rights," such as those endured by many Philadelphia voters with mobility disabilities who cannot vote in their neighborhood polling places or must use difficult or embarrassing alternative means of access (such as being carried or using crutches or walkers in lieu of wheelchairs), also constitutes irreparable harm.  *See Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1084 (N.D. Cal. 1997); ; *see also Burriola v. Greater Toledo YMCA*, 133

---

[14]   There is some "tension" within the Third Circuit's decisions as to whether irreparable harm must be proven in order to secure a permanent injunction, as opposed to a preliminary injunction.  *See Stolt-Nielsen, S.A. v. United States*, 442 F.3d 177, 184 n.5 (3d Cir.) (discussing tension), *cert. denied*, ___ U.S. ___, 127 S. Ct. 494 (2006).  Here, of course, Philadelphia voters with mobility disabilities will experience irreparable harm due to their inability to vote in their neighborhood polling places due to inaccessibility or to vote in their polling places only with difficulty or embarrassment (such as being carried or pulling themselves up the stairs).  Only injunctive relief, not monetary damages, will afford these individuals complete relief.  As such, the harm is irreparable.  *See Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994).

F. Supp. 2d 1034, 1040 (N.D. Ohio 2001) ("the irreparable harm requirement is met when the injuries plaintiff would incur are 'the very type of injuries Congress tried to avoid.'").  More specifically, the inability of an individual with a disability to vote in his assigned polling place constitutes irreparable harm.  *Westchester Disabled on the Move, Inc.  v. County of Westchester*, 346 F. Supp. 2d 473, 477-78 (S.D.N.Y. 2004).  The harm inflicted in this case is particularly outrageous since Defendants "turn[ed] back the clock" with respect to their failure to make accessible those polling places that they had designated as accessible.  *Lovely H. v. Eggleston*, 235 F.R.D. at 262.

The public interest also weighs in favor of the injunctive relief.  "'[T]he passage of the [ADA] itself is an implied finding by Congress that violations will harm the public.'"  *Lonberg v. City of Riverside*, No. EDCV970237SGLAJWX, 2007 WL 2005177 at *7 (C.D. Cal. May 16, 2007); *see also Burriola v. Greater Toledo YMCA*, 133 F. Supp. 2d at 1040 ("There is no doubt that protecting against violations of federal laws serves the public interest.  Additionally, the purpose of the ADA is served by injunctive relief aimed to prevent further discrimination against an individual with a disability."); *Deck v. Toledo*, 29 F. Supp. 2d 431, 434 (N.D. Ohio 1998) ("'there is a significant public interest in eliminating discrimination against individuals with disabilities'").  The "public interest strongly favors mandating accessibility."  *Layton v. Elder*, 143 F.3d at 472.  The public interest also favors enforcement of the ADA's integration mandate.  *Kathleen S. v. Dep't of Public Welfare*, 10 F. Supp. 2d 476, 481 (E.D. Pa. 1998).

Accordingly, both the interests of individuals with mobility disabilities and the public interest strongly favor the issuance of injunctive relief to assure that Defendants comply with the

ADA by maximizing the accessibility of their polling places so as to assure integration of people

with disabilities into community life.

## II.  THE COURT'S PERMANENT INJUNCTIVE RELIEF SHOULD INCLUDE THE APPOINTMENT OF AN EXPERT AND AN ORDER THAT INCLUDES SANCTIONS FOR CONTINUING VIOLATIONS.

The Court's equitable powers to fashion an appropriate remedy for Defendants' continued

failure to maximize the accessibility of its polling places are expansive:

> Once a right and a violation have been shown, the scope of a
> district court's equitable powers to remedy past wrongs is broad,
> for breadth and flexibility are inherent in equitable remedies.
>
> > "The essence of equity jurisdiction has been the
> > power of the Chancellor to do equity and to mould
> > each decree to the necessities of the particular case.
> > Flexibility rather than rigidity has distinguished it.
> > The qualities of mercy and practicality have made
> > equity the instrument for nice adjustment and
> > reconciliation between public interest and private
> > needs ...."

*Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971) (quoting *Hecht Co. v.*

*Bowles*, 321 U.S. 321, 329-330 (1944)); *accord United States v. Paradise*, 480 U.S. 149, 183-84

(1987) (plurality); *Liberty Resources, Inc. v. Southeastern Pennsylvania Transportation Auth.*,

Civil Action No. 99-4837, 2001 WL 1047061 at *3 (E.D. Pa. Aug. 30, 2001), *vacated as moot*,

54 Fed. Appx. 769 (3d Cir. 2002).

Several elements are necessary in this case to fashion an appropriate, effective remedy

to assure maximum polling place accessibility for voters with mobility disabilities.  First, it is

important to assure that all polling places designated by Defendants as accessible are, in fact,

accessible on Election Days, including the forthcoming primary on April 22, 2008 and general

37

election on November 4, 2008.   Second, an expert should be appointed to inspect all of Philadelphia's polling places on actual Election Days both to:  (1) identify any polling places that the City identified as accessible that are not accessible; and (2) evaluate those polling places that the City identified as inaccessible to determine whether they can be made accessible through modifications or relocation.   Third, the expert should make recommendations for polling places designated as inaccessible with respect to either modifications or relocations to other accessible locations within the same division or an adjacent division.   These determinations should be adopted by the Court unless the Defendants can establish it would be a fundamental alteration or undue burden to do so.   Fourth, the Court must provide for some form of sanctions to penalize Defendants for failure to assure that polling places designated as accessible now or in the future are in fact accessible.   Finally, there must be continued vigilance until it becomes clear that Defendants have come into compliance with federal accessibility mandates.

Accordingly, Plaintiffs specifically request that the Court issue an injunction with the following requirements:

1.   Defendants must assure that all polling places designated by Defendants as accessible (fully, substantially, partially, or through alternative entrances) must in future elections   meet the accessibility requirements established by the Department of Justice in *ADA Checklist for Polling Places*.  This includes, but is not limited to, assuring access, if needed, by having appropriate ramps in place during voting hours, providing appropriate signage for alternative entrances, and assuring that entrances are not locked during voting hours.

38

2.      The Court should appoint an expert selected by Plaintiffs and paid for by Defendants with the obligation to (1) hire staff; (2) inspect each polling place designated as accessible (fully, substantially, or through an alternative entrance) in the upcoming primary election scheduled for April 22, 2008 and the general election scheduled for November 4, 2008 to determine whether it in fact is accessible in accordance with the standards established by the Department of Justice in *ADA Checklist for Polling Places* (including, assuring that ramps are in place, appropriate signage is posted, and doors are unlocked); (3) inspect each polling place that the Defendants have designated as inaccessible in the primary election scheduled for April 22, 2008 to determine whether it can be made accessible in accordance with the *ADA Checklist for Polling Places* and, if not, whether there are alternative accessible locations available within the division or an adjacent division to which it can be relocated; and (4) issue reports to the Court and counsel on its findings concerning the primary within sixty (60) days after each election (including, in the report issued following the primary election, recommendations for modifications or relocations for polling places identified as inaccessible.

3.      Prior to the general election in 2008, the Court should order Defendants to implement any recommendations of the expert to make inaccessible polling places accessible (through modifications or relocations) unless Defendants can establish that doing so would constitute a fundamental alteration.

4.     The Court should impose sanctions against the Defendants if polling places that are supposed to be accessible are determined by the expert to be inaccessible in either the primary or general election in 2008.

5.     The Court should allow for further expert reviews in subsequent elections if necessary in light of the findings with respect to the 2008 general election.

## <u>CONCLUSION</u>

For all the reasons set forth above, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Permanent Injunction and order the equitable relief described above.

Respectfully submitted,

Dated: January 11, 2008          By:     /s/ Robert W. Meek
                                         Robert W. Meek
                                         Attorney I.D. No. 27870
                                         Disability Rights Network of PA
                                         1315 Walnut Street, Suite 400
                                         Philadelphia, PA  19107-4798
                                         (215) 238-8070

                                 By:     /s/ Stephen F. Gold
                                         Stephen F. Gold
                                         Attorney I.D. No. 09880
                                         125 South Ninth Street
                                         Suite 700
                                         Philadelphia, PA  19107
                                         (215) 627-7100

                                 By:     /s/ Seth Kreimer
                                         Seth Kreimer
                                         Attorney I.D. No. 26102
                                         3400 Chestnut Street
                                         Philadelphia, PA  19104
                                         (215) 898-7447

                                         Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I, Robert W. Meek, certify that the foregoing Motion for Permanent Injunction, Memorandum of Law in Support of that Motion, and proposed Order were filed with the Court's ECF system on January 11, 2008 and are available for viewing and downloading from the ECF system by the following counsel who consented to electronic service:

Abbe F. Fletman, Esquire
Tara S. Parvey, Esquire
Flaster/Greenberg, P.C.
Eight Penn Center, 15th Floor
1628 John F. Kennedy Boulevard
Philadelphia, PA  19103


/s/ Robert W. Meek
Robert W. Meek