IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN KERRIGAN, ET AL. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| THE PHILADELPHIA BOARD | : | |
| OF ELECTION, ET AL. | : | NO. 07-687 |

## MEMORANDUM

**Padova, J.**                                                                    **August 14, 2008**

Plaintiffs, individuals with mobility disabilities who are registered to vote in the City of Philadelphia, have brought this action against the Philadelphia Board of Elections[1] and the Commissioners of the City of Philadelphia in charge of elections, alleging that Defendants have violated their civil rights under Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132, and § 504 of the Rehabilitation Act of 1973 (the "RA"), 29 U.S.C. § 794(a), by denying them equal and integrated access to neighborhood polling places in Philadelphia. Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion is granted in part and denied in part.

## I.      FACTUAL BACKGROUND

Philadelphia is divided into 66 wards with a total of 1,681 polling divisions. (Def. Statement of Undisputed Facts ¶¶ 1, 2; Pl. Resp. ¶¶ 1, 2; Pl. Ex. 3.)   The divisions are selected by the Philadelphia Board of Elections (the "Board") and the individual City Commissioners. 25 Pa. Stat. Ann. § 2726(a).  The polling place for a division must be located in the division or in an adjacent division. 25 Pa. Stat. Ann. § 2727(a).

---

[1]The Philadelphia Board of Elections was incorrectly designated as the "Philadelphia Board of Election" in the Complaint.

Robert Lee, Voter Registration Administrator for the Board, estimates that there are between 1,000 and 1,200 polling places in Philadelphia.  (Lee Decl. ¶ 1; Lee Dep. at 38-39.)  There are fewer polling places than polling divisions because two or more polling divisions may be assigned to the same polling place.  (Lee Dep. at 38.)  Defendants assign each registered voter to a specific division near his or her home.  (Compl. ¶ 23; Defs. Ans. ¶ 23.)  Registered voters are required to vote in the polling places to which they are assigned, unless they vote by alternative or absentee ballot or at City Hall on election day.  Dept. of State, Commonwealth of Pennsylvania, Procedures to Assure Compliance with the Voting Accessibility for the Elderly and Handicapped Act and Other Laws Assuring the Voting Rights of Individuals with Disabilities and Language Needs ("Pa. Voting Accessibility Procedures") §§ 4(b), 6, 8 and 9, available at http://www.hava.state.pa.us/hava/lib/hava /095policiesandprocedures/vaa_policy.pdf (last visited 6/6/08).  Many of the polling places are located in facilities owned by private parties or by public entities other than the City of Philadelphia. (Pl. Ex. 3.)

The Board has received, through the state, approximately $11 million in federal money pursuant to the Help America Vote Act ("HAVA"), 42 U.S.C. § 15301, et seq., to address voting accessibility issues.  (Lee Dep. at 83-86.)  The bulk of that money has been allocated for voting systems.  (Id. at 85.)  Approximately $1.4 million has been designated for polling place accessibility. (Id. at 86.)  Philadelphia has used about $60,800 of that money so far.  (Id. at 85-86.)  The Board intends to use some of the remaining money to reimburse the Philadelphia school system for making accessibility modifications to schools used as polling places and has considered using some of the money to make private properties used as polling places accessible.  (Id. at 87-88.)  The Board has also committed to use $580,000 to modify city owned facilities, mostly recreation centers and a few

libraries, to make them accessible.  (Id. at 88-89.)

      A.     Pennsylvania's Voting Accessibility Procedures

Under the Voter Accessibility for the Elderly and Handicapped Act ("VAEH"), 42 U.S.C. § 1973ee-1, *et seq.*, the Secretary of the Commonwealth is required to establish guidelines for the accessibility of polling locations, defining what is accessible, determining what alternative voting methods are allowable, and assuring that those methods are in place.  42 U.S.C. §§ 1973ee-1, 1973ee-6(1).  According to the VAEH and the Pa. Voting Accessibility Procedures, county boards of elections "are required to 'assure that *all* polling places for Federal elections are accessible to handicapped and elderly voters.'"  Pa. Voting Accessibility Procedures § 1(c)(1) (quoting 42 U.S.C. § 1973ee-1(a)).  There are limited exceptions to this requirement: (1) when the "Secretary of the Commonwealth has determined that an emergency exists such that the county board of elections cannot reasonably provide an accessible polling place for one or more election districts" and (2) where the Secretary of the Commonwealth has determined that no accessible polling place is available and has assured that any handicapped or elderly voter assigned to an inaccessible polling place will be assigned to an accessible polling place or provided with an alternative means for casting a ballot on the day of the election.  Id. § 1(c)(2).

The Pa. Voting Accessibility Procedures state that the Secretary of the Commonwealth:

> periodically directs the county boards of elections to conduct a survey
> of their polling places to determine the accessibility of the polling
> places under guidelines issued by the Secretary of the
> Commonwealth, and to make good faith efforts on an ongoing basis
> to identify accessible polling places (or polling places that can be
> made accessible for voting on Election Day) for each election district
> in the county.

Id. § 3(a).  The Board conducted an accessibility assessment of all polling locations in the spring of

2002 and, in the summer of 2006, evaluated 596 divisions with inaccessible polling locations to determine if those polling places could be modified to be accessible or relocated to an accessible facility.  (Lee Decl. ¶¶ 22-23.)  In the summer of 2007, the Board evaluated an additional 225 divisions with inaccessible polling locations to determine if those polling locations could be modified to be accessible or relocated to an accessible facility.  (Id. ¶ 25.)  The Board also conducts a thorough search for an accessible location each time a new polling place location must be selected. (Lee Decl. ¶¶ 9-15.)  During the summer of 2004, the Board submitted a state accessibility survey form for each polling location to the Secretary of the Commonwealth using the information gathered in the spring of 2002.  (Id. ¶ 5.)  Every June, the Board sends the Secretary of the Commonwealth copies of the state accessibility survey forms for each new or relocated polling place.  (Id. ¶ 6.)

    B.    The Alternative Ballot

    The Secretary of the Commonwealth has implemented an alternative balloting procedure to ensure "that any handicapped or elderly voter assigned to a polling place deemed inaccessible by the county board of elections would have another means to cast a ballot on or before Election Day."  Pa. Voting Accessibility Procedures § 4(a).  These procedures apply to state as well as federal elections. Id. § 2.  These procedures are the sole means for casting a ballot through alternative methods in Pennsylvania.  Id. § 4(c).

    A polling place is deemed inaccessible for the purpose of voting by alternative ballot if it does not meet all federal and state criteria for a fully accessible building and handicapped parking. (Pl. Ex. 29.)  Registered voters may not vote by alternative ballot if they are assigned to accessible polling places.  Pa. Voting Accessibility Procedures § 4(d).  Philadelphia voters may request alternative ballot applications in person at City Hall or over the phone.  (Pl. Ex. 29.)

4

Qualified voters who are unable, because of a permanent or temporary disability, to vote in their assigned polling place may vote by absentee ballot even if they have been assigned to an accessible polling place. Pa. Voting Accessibility Procedures § 5(a). Applications for absentee or alternative ballots, except for emergency applications, must be submitted at least 7 days before the election day. Id. § 8(d)(1). Applicants must complete an Absentee/Alternative Ballot application form in order to vote by alternative or absentee ballot. (Lee Decl. ¶ 40, Ex. 3; Lee Dep. at 282-84.) A voter who requests an absentee ballot because of illness or disability, or who requests an alternative ballot because he or she is handicapped or age 65 or older and has been assigned to an inaccessible polling place, is required to fill out section C of the application, which requires that individual to describe the nature of his or her disability. (Lee Decl., Ex. 3 at 2.) Section C also requires disclosure of the name of the voter's physician and the physician's address and phone number.[2] (Id.)

In Philadelphia, alternative ballots must be returned to City Hall by 8:00 p.m. on election day. (Lee Dep. at 303, Lee Decl. Ex. 3 at 2.) The voter can mail the ballot in advance, or deliver it in person on election day. (Id.) Approximately 2,000 alternative ballots were cast in the April 22, 2008 primary election. (Id. at 286.) It is not known how may of these alternative ballots were cast by disabled voters. (Id.)

In an emergency, such as when a disabled voter learns after the application deadline that he or she has been assigned to an inaccessible polling place, the disabled voter may make an Emergency

---

[2] The check-off box for handicapped or age 65 or older contains the additional instruction that voters should sign Section C, and that no other information is required of that voter in Section C. (Lee Decl., Ex. 3 at 2.) This instruction directly contradicts the general instructions for filling out the application. (Id.)

Application for Alternative Ballot at any time until the polls close on election day.  Pa. Voting
Accessibility Procedures § 8(d)(2).  An applicant for an emergency alternative ballot must satisfy
all of the requirements for eligibility to vote by alternative ballot, including the requirement that the
voter be assigned to a polling place which has been designated by Defendants as inaccessible.  Id.
§ 8(d)(2).[3]   The emergency alternative ballot application may only be obtained at City Hall and
requires applicants to describe the nature of their disability.  (Lee Dep. at 316-17, Pl. Ex. 27.)  The
voter may use a designated agent to pick up and return the emergency application for alternative
ballot.  (Lee Dep. at 319.)  A voter using a designated agent must also complete and submit an agent
delivery form.  (Id.)

Defendants have created a poster which contains information regarding emergency alternative
ballots that is supposed to be posted inside and outside of polling places on election day.  (Lee Dep.
at 318; Pl. Ex. 29.)  Consequently, if a mobility disabled voter arrives at his or her polling location
and discovers that it is not accessible, the poster should inform that voter about the emergency
alternative ballot.  (Lee Dep. at 315-17.)  This information is also available on the Board's website.
(Id.)  The poster was not posted outside of all polling places on April 22, 2008.  (Supp. Resnick
Decl. ¶ 35, Turner Decl. ¶ 26, Suppl. Salandra Decl. ¶ 25, Suppl. Kane Decl. ¶ 17.)

C.    Polling place accessibility designations

Prior to each scheduled election day, Defendants publish a notice in local newspapers that

---

[3]In contrast, a person with disabilities may also vote by absentee ballot "[i]rrespective of the
accessibility of a qualified elector's polling place . . . ."  Pa. Voting Accessibility Procedures § 5(a).
However, the last time such a voter may make an emergency application for absentee ballot is 5 p.m.
the Friday before Election Day.  Id. § 5(d)(1).  An eligible voter who is unable to do so, "may apply
to the Court of Common Pleas for an order directing the county board of elections to issue an
absentee ballot to the elector . . . ."  Id. § 5(d)(2).

lists the polling place location for each division (the "Notice").[4]  See 25 Pa. Stat. Ann. § 2726(c).

The Board uses the following designations to describe the accessibility of a polling place:

> **FH** = Fully Accessible for disabled; designated parking for disabled
> **BL/RL** = Building substantially Accessible for Disabled with minor assistance, Passenger Loading Zone
> **BN/RN** = Building substantially Accessible for disabled with minor assistance, No Parking
> **AL** = Building Accessible by Alternative entrance, Passenger Loading Zone, Call 215-686-1523
> **AN** = Building Accessible by Alternative entrance, No Parking, Call 215-686-1523
> **NL** = Building Inaccessible, Passenger Loading Zone
> **NN** = Building Inaccessible for disabled, No Parking

(Pl. Ex. 3; Lee Dep. at 224-27.)   The first letter of the designation refers to the accessibility of the building, the second letter to the accessibility of the parking.  (Lee Dep. at 230.)  The Board's accessibility designations are based on information derived from the Board's accessibility surveys of polling places, using standards established by the Pennsylvania Department of State.  (Lee Dep. at 227-28, 229.)  Pennsylvania's accessibility standards include the following criteria: the pathway must be free of steps from the parking space for the disabled voter to the accessible entrance to the polling place; all ramps, with the exception of curb ramps, must have handrails; it must be possible to approach and enter the building, reach the voting room, vote and leave the building without climbing one or more stairs; thresholds or doorsills must be ½ inch or less in height; and clearances through doorways used by the disabled voter must be at least 32 inches wide.[5]  (Lee Dep. at 48, Pl.

---

[4]Pl. Ex. 3 is the Notice for the April 22, 2008 primary election.  The Notice for the November 6, 2007 general election is Ex. A to Plaintiffs' Motion for Permanent Injunction.

[5]These standards are less specific than standards developed by the Department of Justice ("DOJ") for ADA compliance, but contain many of the same elements.  Compare Guidelines and Definitions Issued by the Secretary of the Commonwealth For the Implementation of the Federal Voting Accessibility for the Elderly and Handicapped Act (P.L. 98-435), available at

Ex. 5.)

For the April 22, 2008 primary election, Philadelphia had 110 polling divisions that were located in facilities that were fully accessible under Pennsylvania's accessibility standards, these divisions were designated by Defendants as "FH." (Lee Dep. at 47-48; Pl. Ex. 4.) Defendants use the designations NN or NL to denote polling divisions located in buildings that are inaccessible. (Lee Dep. at 226-27.) According to Robert Lee, the City presently has 224 inaccessible polling divisions. (Suppl. Lee Decl. ¶ 18, Ex. 1.)

If a polling place does not fully meet federal and state criteria for accessibility, but provides relative accessibility with minor assistance in entry, the Board designates it with a "B." (Pl. Ex. 29, Lee Dep. at 225.) Defendants use the designations BN and BL to denote polling divisions which are located in facilities that are substantially accessible and do not have steps, but which do not comply with Pennsylvania's accessibility standards for the following reasons: the doors are too heavy; the door hardware is not accessible; there is a threshold or doorsill in excess of ½ inch but no greater than one inch high; individuals might need assistance to traverse the ramp; the door is less than 32 inches wide; or the parking does not meet Pennsylvania's accessibility standards. (Lee Dep. at 80-81, 236, 241, 271, 277-78.) The Board has designated 1130 polling divisions as BN or BL. (Pl. Ex. 4.) Defendants use the designations RN and RL to denote polling divisions that are located in facilities that are substantially accessible and for which Defendants provide portable ramps. (Lee Dep. at 81-82, 233-35.) Polling place officials are instructed to install the ramps when they open the polls. (Id. at 242.) The Board has designated 80 polling divisions as RN or RL. (Pl. Ex. 4.)

---

http://www.hava.state.pa.us/hava/cwp/view.asp?a=1227&Q=444671&havaNav=| (last visited 7/22/08) with DOJ Checklist for Polling Places (Feb. 2004), available at http://www.ada.gov/votingchecklist.htm.

The designations AL and AN are used to denote polling divisions that are located in facilities with inaccessible primary entrances (two or more steps), but other entrances that are accessible. (Lee Dep. at 244.) The Board has designated 145 polling divisions as AL or AN. (Pl. Ex. 4.) Defendants post signs indicating the availability of an alternative accessible entrance outside polling places that have been designated as AL or AN. (Lee Dep. at 246-47.) Board employees write specific directions to the alternative entrance on the bottom of each sign. (Lee Dep. at 247.) The signs are placed near the inaccessible main entrance to the polling location on the Saturday and Sunday preceding the election. (Lee Dep. at 247, Pl. Ex. 6.) The Board does not require that the alternative entrance be unlocked on election day. (Lee Dep. at 248-49.) The Department of Justice ("DOJ") mandates, however, that alternative accessible entrances to polling places "must remain open when the polling place is open." DOJ Checklist for Polling Places (Feb. 2004) at 19, available at http://www.ada.gov/votingchecklist.htm.

Between November 2007 and April 2008, Defendants reviewed every polling place for accessibility designation. (Lee Dep. at 28-29.) Despite this effort, Plaintiffs have found that those designations were incorrect in connection with 32 polling places. After Plaintiffs filed their Motion for a Permanent Injunction in January 2008, Defendants changed the accessibility designations for 22 polling places that Plaintiffs identified in their Motion as being improperly designated. (Pl. Mot. for Perm. Inj. at 4-10; Pl. Ex. 3.). Plaintiffs have submitted evidence that the following ten polling divisions are still incorrectly designated: Ward 5/Div. 19; Ward 21/Div. 1; Ward 24/Div. 4; Ward 24/Div. 15; Ward 31/Div. 15; Ward 32/Div. 1; Ward 32/Div. 9; Ward 34/Div. 5; Ward 50/Div. 9; Ward 65/Div. 21. (Pl. Exs. 3, 5; Supp. Resnick Decl. ¶¶ 8, 11, 12, 16; Supp. Shilliday Decl. ¶ 8; Supp. Kane Decl. ¶ 12; Turner Decl. ¶¶ 15-16; Supp. Salandra Decl. ¶ 24.)

In connection with their Motion for a Permanent Injunction, Plaintiffs submitted evidence that 36 polling places designated by Defendants as accessible (FH, BL, BN, RN, RL, AL or AN) in the Notice for the November 6, 2007 election were not accessible or had accessibility issues.[6]  Of those 36 polling places, 29, serving 40 divisions, were inaccessible during the November 6, 2007 general election because they had unramped entrance steps and no accessible alternative entrances. The remaining seven polling places, serving eleven divisions, were effectively inaccessible during the November 6, 2007 general election because they were not properly designated as "AL" or "AN" in the Notice and there were no signs directing voters to the accessible entrance or the accessible entrance was difficult to locate.

On April 22, 2008, seven individuals reviewed 222 polling places in Philadelphia on Plaintiffs' behalf.  (Meek Decl. ¶¶ 2-3.)  Two hundred and ten of those polling places had been designated in the Notice for the April 22, 2008 primary election as accessible (FH, BL, BN, RN, RL, AL or AN).  (Pl. Ex. 3.)  Plaintiffs have submitted evidence that, of the 210 polling places that were designated as accessible, 114 polling places serving 179 divisions were not accessible on April 22, 2008 because they had unramped entrance steps and no accessible alternative entrances, or otherwise failed to comply with the Guidelines and Definitions Issued by the Secretary of the Commonwealth For the Implementation of the Federal Voting Accessibility for the Elderly and Handicapped Act (P.L. 98-435), available at http://www.hava.state.pa.us/hava/cwp/view.asp?a=1227&Q=444671& havaNav=| (last visited 7/22/08)  or the DOJ Checklist for Polling Places.[7]  Plaintiffs have identified

_____

[6]We have summarized the evidence submitted by Plaintiffs with respect to these 36 polling places in Appendix A hereto.

[7]We have summarized the evidence submitted by Plaintiffs with respect to these 114 polling places in Appendix B hereto. Of these 114 polling places, seven polling places serving twelve

a total of 207 separate polling divisions which were located in facilities that Defendants designated as accessible but were not accessible on election day.

Plaintiffs have submitted testimony from individuals with mobility disabilities stating that they have been prevented from voting, or have been able to vote only with difficulty or with assistance, because their assigned polling places were inaccessible.  (Concepcion Dep. at 10-13 (unable to vote at inaccessible polling place); Mangum Dep.  at 25-28 (unable to vote at inaccessible polling place); McShea Dep. at 15-21 (needed assistance to get into basement polling place using his wheelchair); Kerrigan Dep. at 16-20, 28 (needed assistance to get wheelchair over step in order to enter polling place); Davenport Dep. at 26, 30 (had to pull herself up four stairs using stair railing in order to enter polling place); Ramnathsingh Dep. at 14 (needed assistance with steps at polling place); Ahmad Dep. at 14-17, 32-35 (needed help with steps to enter polling place)).  Many of these individuals also testified that they were unaware of the alternative ballot process.  (Mangum Dep. at 34; Davenport Dep. at 48; Kerrigan Dep. at 21-22, 32, 33; Ramnathsingh Dep. at 17; Ahmad Dep. at 20-22.)

      D.    <u>Polling place relocation</u>

Voters may request that a polling place be moved by submitting a petition from 10 qualified voters to the Board.   25 Pa. Stat. Ann. § 2726(a).  Even without requests, the Board's staff periodically recommends that polling places should be relocated from inaccessible to accessible locations.  (Lee Dep. at 110-11.)   Recommendations for changes in polling place locations must be submitted to the City Commissioners for approval.  (<u>Id.</u> at 111.)

---

divisions were also found to be inaccessible by Plaintiffs on November 6, 2007: Ward 2/Div. 25; Ward 3/Div. 7; Ward 22/Divs. 18, 19; Ward 41/Divs., 13, 14; Ward 41/Div. 19; Ward 53/Div. 18; and Ward 61/Divs. 2, 3, 4, 7, 8.

The Board's staff considers the following criteria in determining whether to recommend a change in a polling location to the City Commissioners:  (1) the proposed location must be accessible; (2) the proposed location must be in the same, or an adjacent, division; (3) the distance from the farthest edge of the division to the proposed new polling location cannot be more than five blocks; (4) there must be no physical barriers between the current location and the proposed location (such as major highways, rivers, creeks, parks, industrial/commercial areas, or four-lane streets, regardless of whether there are traffic lights or whether people routinely cross at those intersections); and (5) there must be sufficient room at the proposed location to accommodate the polling division. (Lee Dep. at 120-27, 129; Pl. Ex. 18.)  These criteria were developed by Board staff and are not required by state law. (Lee Dep. at 124, 126.)  If these criteria are met, Board staff will conclude that relocation of the polling place would be feasible and not unduly burdensome for voters and will recommend that the City Commissioners hold a hearing on the proposed change.  (Id. at 122.)

The City Commissioners hold hearings prior to each election to consider changes to polling place locations.  (Lee Decl. ¶¶ 18-21.)  The City Commissioners consider accessibility and the impact of the proposed location on other (non-disabled) voters, when they decide which location to use. (Id. ¶ 21.) Prior to a hearing, the City Commissioners notify the affected Ward leaders and post hearing notices in five locations (the current polling location, the proposed polling location, and three other locations within the division) (Lee Dep. at 114.)   The hearings are recorded by a stenographer.  (Id. at 152.)  Witnesses do not testify under oath.  (Id.)  Ward leaders and committee people attend the hearings and are asked whether they agree or disagree with the proposed relocation. (Id. at 153-54.)  The  decisions of the City Commissioners regarding polling place relocations can be appealed to the Philadelphia Court of Common Pleas.  2 Pa. Cons. Stat. Ann. §§ 751, 752.

12

Plaintiffs have submitted evidence of 41 inaccessible polling locations that could be moved to accessible locations in the same division or an adjacent division. (Pl. Statement of Suppl. Material Facts ¶¶ 141-182.)   Board staff recommended that hearings be held with respect to 27 of these locations:  Ward 2/Div. 25; Ward 4/Div. 3; Ward 4/Div. 10; Ward 4/Div. 15; Ward 4/Div. 16; Ward 10/Div. 9; Ward 11/Div. 14; Ward 15/Div. 8; Ward 15/Div. 12; Ward 15/Div. 15; Ward 15/Div. 17; Ward 15/Div. 18; Ward 17/Div. 24; Ward 25/Div. 1; Ward 26/Div. 22; Ward 32/Div. 3; Ward 32/Div. 22; Ward 33/Div. 4; Ward 38/Div. 21; Ward 39/Div. 3; Ward 39/Div. 20; Ward 39/Div. 33; Ward 40/Div. 19; Ward 41/Div. 2; Ward 41/Div. 23; Ward 44/Div. 9; Ward 58/Div. 25.  (Pl. Ex. 20; 9/27/06 Hr., N.T. at 59; Pl. Ex. 24; Pl. Ex. 25.)  Hearings were held with respect to 23 of these proposals, and the Commissioners denied all 23 of the proposed relocations.[8]  Twelve relocation proposals were rejected based on representations that the current facilities had, or would obtain ramps.  Those facilities were, however, still inaccessible during the April 22, 2008 primary election. Eight relocation proposals were denied based upon representations that elderly voters had, or would, object to the relocation and/or because the new location was too far away.[9]  One other proposed relocation was denied for safety reasons and another was rejected because the proposed new location was overcrowded.

II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories,

---

[8]We have summarized the evidence submitted by the parties with respect to these proposed polling place relocations in Appendix C hereto.

[9]There was testimony presented at the City Commissioner's hearings that two of those polling places, Ward 39/Divs. 3, 20 (one polling place) and Ward 39/Div. 33, were to receive ramps that would make them accessible.  (9/27/06 Hrg., Tr. at 89-93, 10/3/07 Hrg., Tr. at 48-50.) Those polling places are still inaccessible.  (Pl. Ex. 3.)

13

and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by affidavits or otherwise as provided in this rule -- set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Tech., Inc., 78 F. Supp. 2d 402, 407 (E.D. Pa. 2000) (citations omitted). Indeed, evidence introduced to defeat or support a motion for summary judgment must be capable of being admissible at trial. Callahan v. A.E.V., Inc., 182 F.3d 237, 252 n.11 (3d Cir. 1999) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1234 n.9 (3d Cir. 1993)).

14

## III. DISCUSSION

### A. Plaintiffs' Claims

Plaintiffs' claims arise under Title II of the ADA, 42 U.S.C. § 12132 and §504 of the RA, 29 U.S.C. § 794. Title II of the ADA provides that: "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The RA provides, in pertinent part, that: "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a).

Plaintiffs make seven specific claims of discrimination pursuant to the ADA and RA. In their first claim, Plaintiffs contend that, by failing to assure the accessibility of all of their polling places that can be made accessible, Defendants have excluded them from participation in, or denied them the benefits of, their program of voting in the manner that is available to non-disabled people, in violation of the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(a), and the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(a).[10] In their second claim, Plaintiffs assert that, by failing to assure that all

---

[10] 28 C.F.R. § 35.130(a) provides that: "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F. R. § 41.51(a) similarly provides that "[n]o qualified handicapped person, shall, on the basis of handicap, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any program or activity that receives or benefits from federal financial assistance." These regulations, which were developed by the DOJ to implement the ADA and RA, "are given controlling weight, '[u]nless the regulations are arbitrary, capricious or manifestly contrary to the statute.'" Liberty Res., Inc. v. Phila. Hous. Auth., 528 F. Supp. 2d 553, 564 n.17 (E.D. Pa. 2007) (quoting Helen L. v. DiDario, 46 F.3d 325, 331 (3d Cir. 1995)).

polling places that can be made accessible are accessible,  Defendants have failed to afford them with equal opportunity to participate in the voting process, in violation of the ADA,  42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(1), and the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(1).[11]  In their third claim, Plaintiffs contend that Defendants have violated the ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(4), and the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(4), by selecting inaccessible polling places and not making those polling places accessible through temporary alterations or selecting alternative, accessible, sites.[12]  In their fourth claim, Plaintiffs assert that Defendants have violated the ADA's and RA's prohibition on discriminatory methods of administration, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(3), and 29 U.S.C. § 794 and 28 C.F.R. § 41.51(b)(3), by printing misleading and confusing information about polling location accessibility in their Notices, failing to assure that polling places that can be made accessible are accessible on Election Day, and refusing to relocate inaccessible polling locations to accessible locations when it would be feasible to do so.[13]  In their fifth claim, Plaintiffs aver that Defendants have violated the

---

[11]28 C.F.R. § 130(b)(1) and 28 C.F.R. § 41.51(b)(1) require "that qualified individuals with a disability be afforded an opportunity to benefit from and participate in public programs that is both meaningful and equal to the opportunity afforded people without disabilities."  Anderson v. Pennsylvania Dep't of Pub. Welfare, 1 F. Supp. 2d 456, 463 (E.D. Pa. 1998) (citing 28 C.F.R. § 35.130(b)(1)(ii) and Alexander v. Choate, 469 U.S. 287, 301 (1985)).

[12]28 C.F.R. § 130(b)(4) and 28 C.F.R. § 45.51(b)(4) provide that a public entity (or, under the RA, an entity that receives federal financial assistance) may not select a site or location for a facility that (1) effectively excludes persons with disabilities, denies them the benefits of the entity's program, or otherwise subjects them to discrimination or (2) has the "purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the service, program, or activity with respect to" disabled persons.  See 28 C.F.R. § 130(b)(4) and 28 C.F.R. § 45.51(b)(4).

[13]28 C.F.R. § 35.130(b)(3) and 28 C.F.R. § 41.51(b)(3) provide that a public entity (or, under the RA, an entity that receives federal financial assistance) may not utilize methods of administration that (1) subject disabled individuals "to discrimination on the basis of disability" or (2) have the "purpose or effect of defeating or substantially impairing the accomplishment of the objectives" of

ADA, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7), and the RA, 29 U.S.C. § 794, by failing to

make reasonable modifications in their policies, practices and procedures to avoid discrimination.[14]

In their sixth claim, Plaintiffs maintain that Defendants have violated the ADA, 42 U.S.C. § 12132

and 28 C.F.R. § 35.130(d), and the RA, 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d), by failing to

provide services in the most integrated setting possible.[15]   In their seventh claim, Plaintiffs contend

that Defendants have violated the ADA's and RA's program accessibility mandate, 42 U.S.C. §

12132 and 28 C.F.R. § 35.150, and 29 U.S.C. § 794 and 28 C.F.R. § 41.57, by failing to assure that

the City's program of voting is readily accessible to and usable by individuals with disabilities.[16]

_____

the program or activity with respect to individuals with disabilities.  See 28 C.F.R. § 130(b)(3) and
28 C.F.R. § 45.51(b)(3).

    [14]28 C.F.R. § 130(b)(7) provides that "[a] public entity shall make reasonable modifications
in policies, practices, or procedures when the modifications are necessary to avoid discrimination
on the basis of disability, unless the public entity can demonstrate that making the modifications
would fundamentally alter the nature of the service, program, or activity."  The RA has also been
interpreted to require a recipient of federal financial assistance to make reasonable modifications.
See Alexander, 469 U.S. at 301 n.21.

    [15]The United States Court of Appeals for the Third Circuit has explained that the integration
mandate requires a public entity (or recipient of federal financial assistance) to:

> "administer services, programs, and activities in the most integrated
> setting appropriate to the needs of qualified individuals with
> disabilities."  28 C.F.R. § 35.130(d) (implementing the ADA's
> integration requirement); see also 28 C.F.R. § 41.51(d)
> (implementing the RA's integration requirement). "[T]he most
> integrated setting appropriate to the needs of qualified individuals
> with disabilities" is a setting that "enables individuals with
> disabilities to interact with nondisabled persons to the fullest extent
> possible." 28 C.F.R. pt. 35 app. A.

Pennsylvania Protection and Advocacy, Inc. v. Pennsylvania Dep't of Pub. Welfare, 402 F.3d 374,
379 (3d Cir. 2005).

    [16]The ADA's and RA's program accessibility mandate states, generally, that "[a] public entity
shall operate each service, program, or activity so that the service, program, or activity, when viewed
in its entirety, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. §

   B.    Legal Standard For Proof of a Claim Under Title II of the ADA and § 504 of the RA

   We apply a burden shifting analysis to claims of discrimination brought pursuant to Title II

of the ADA and § 504 of the RA.  We first determine whether a plaintiff has satisfied his or her

burden of making a prima facie showing of discrimination:

> When analyzing whether a violation of either Title II or Section 504
> has occurred, the first step a court must take in a disability
> discrimination case is to determine if there is a prima facie showing
> of discrimination.  In order to establish a prima facie showing of
> disability discrimination under the RA, the plaintiff bears the burden
> of proving that 1) he or she is a "handicapped individual," 2) he or
> she is "otherwise qualified" for participation in the program, 3) the
> program receives "federal financial assistance," and 4) he or she was
> "denied the benefits of" or "subject to discrimination" under the
> program.  Nathanson v. Medical College of Pennsylvania, 926 F.2d
> 1368, 1380 (3d Cir. 1991) (quoting Strathie v. Department of Transp.,
> 716 F.2d 227, 230 (3d Cir. 1983)).  Similarly, under Title II of the
> ADA a plaintiff must establish that 1) he or she has a disability; 2) he
> or she is otherwise qualified; and 3) he or she is being excluded from
> participation in, being denied the benefits of, or being subjected to
> discrimination under the program solely because of her disability.
> Jones v. City of Monroe, 341 F.3d 474, 477 (6th Cir. 2003); Henrietta
> D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).

Liberty Res., Inc. v. Phila. Hous. Auth., 528 F. Supp. 2d 553, 565 (E.D. Pa. 2007).  If Plaintiffs are

able to make a prima facie showing of discrimination in violation of the ADA and RA, they have the

additional burden "of articulating reasonable accommodations that the defendant can make in order

to comply with the ADA and the RA."  Id. (citing Frederick L. v. Dep't of Pub. Welfare of

Commonwealth of Pennsylvania, 364 F.3d 487, 492 n.4 (3d Cir. 2004)).  If the plaintiff is able to

articulate reasonable accommodations, the burden "shifts to the defendant to make any reasonable

accommodations, unless the defendant can prove that the accommodations would be unduly

―――――――――――――――

35.150(a); see also 28 C.F.R. § 41.57(a).

18

burdensome or fundamentally alter the program." <u>Id.</u> (citing <u>Frederick L.</u> at 487, 492 n.4 and

<u>Nathanson</u> at 1384).

Defendants argue that they are entitled to the entry of summary judgment in their favor

because Plaintiffs have failed to come forward with evidence sufficient to set forth a prima facie case

of discrimination under the ADA or RA and to articulate specific reasonable modifications to the

City's program of voting which will bring it into compliance with the ADA and RA.  They also

argue that their program of voting satisfies the VAEH, which, they claim, takes precedence over the

ADA.  Defendants further argue that this action should be dismissed because Plaintiffs have failed

to join indispensable parties to this action, namely the Commonwealth of Pennsylvania and the

owners of the private properties used by the City as polling locations; and that the Board and City

Commissioners should be dismissed because they are not the proper defendants to this suit.

C.      Prima Facie Case of Discrimination

Defendants argue that they are entitled to summary judgment because Plaintiffs cannot

establish a prima facie case of discrimination under the ADA and RA.[17]  Defendants do not challenge

the first two elements of a prima facie case of discrimination under the ADA and RA, that Plaintiffs

are disabled and otherwise qualified to participate in Defendant's program of voting.  They also

don't challenge the requirement for a claim under the RA that their program of voting receives

---

[17]Defendants argue that Plaintiffs cannot establish a prima facie case of discrimination in
connection with their program access claims, claims 1, 2, 7; discriminatory site selection claim,
claim 3; and integration mandate claim, claim 6.  Defendants do not specifically address Plaintiffs'
discriminatory methods of administration claim, claim 4, or Plaintiffs' reasonable modifications
claim, claim 5.  Defendants do, however, argue that, if Plaintiffs are able to establish a prima facie
case of discrimination, they have failed to meet their burden of coming forward with reasonable
modifications.  Consequently, we address Plaintiffs' burden with respect to the existence of
reasonable modifications in connection with that argument, in section D, below, rather than in the
context of Plaintiffs' prima facie claims of discrimination.

federal financial assistance.  They challenge only the remaining element, that Plaintiffs are being excluded from participation in, being denied the benefits of, or being subjected to discrimination under, the City's program of voting solely because of their disabilities.

        1.    <u>Defendants' program of voting</u>

Defendants argue that Philadelphia's program of voting (when viewed as a whole) meets the requirements of the  ADA and RA because at least three-quarters of the City's polling locations are accessible and voters with mobility disabilities can vote through alternative and absentee ballots and emergency alternative ballots either at home or at City Hall.  Plaintiffs, however, contend that each of Defendants' polling locations constitutes a separate program of voting pursuant to the ADA and RA and, accordingly, each must separately satisfy the accessibility requirements of the ADA and the RA.  Consequently, before we can determine whether the City's program of voting violates the ADA and RA, we must decide whether the program of voting encompasses voting city-wide, including absentee and alternative ballots, or whether each of the City's polling locations constitutes a separate program.

Defendants maintain that their program of voting, for purposes of the ADA and RA, encompasses all of their voting processes and procedures, city-wide, because they are not required to make each of their existing facilities accessible.  The ADA's regulations regarding program accessibility do not "[n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities . . . ." 28 C.F.R. § 35.150(a)(1).  In addition, the DOJ's <u>Americans with Disabilities Act, Title II Technical Assistance Manual</u>, (1993) ("Technical Assistance Manual"), <u>available at</u> http://www.ada.gov/taman2.html, similarly states that program accessibility does not necessarily require that a public entity make all of its existing facilities

accessible:

> A public entity may not deny the benefits of its programs, activities, and services to individuals with disabilities because its facilities are inaccessible. A public entity's services, programs, or activities, when viewed in their entirety, must be readily accessible to and usable by individuals with disabilities. This standard, known as "program accessibility," applies to all existing facilities of a public entity. Public entities, however, are not necessarily required to make each of their existing facilities accessible.

Technical Assistance Manual § II-5.1000.  The United States Court of Appeals for the First Circuit has explained that "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available."  Parker v. Universidad de Puerto Rico, 225 F.3d 1, 6 (1st Cir. 2000) (citation omitted).  Therefore, as the United States Court of Appeals for the Tenth Circuit has instructed, "when determining the compliance of existing facilities with the ADA under program accessibility, courts must look at the accessibility of the facilities as a whole, not at individual elements."  Chaffin v. Kansas State Fair Bd., 348 F.3d 850, 861 (10th Cir. 2003) (quotation omitted).

Plaintiffs, however, maintain that, since each Philadelphia voter is assigned to a polling location and cannot be reassigned to an alternative, accessible, location,[18] each polling place constitutes a unique program and each must be accessible.  Plaintiffs rely on two illustrations from the Technical Assistance Manual:

> ILLUSTRATION 2: D, a defendant in a civil suit, has a respiratory condition that prevents her from climbing steps. Civil suits are

---

[18]The Pa. Voting Accessibility Procedures provide that county boards of elections may not assign disabled voters "to an accessible polling place other than the polling place to which they have been assigned based on their residence address . . . ."  Pa. Voting Accessibility Procedures § 4(b).

routinely heard in a courtroom on the second floor of the courthouse. The courthouse has no elevator or other means of access to the second floor. The public entity must relocate the proceedings to an accessible ground floor courtroom or take alternative steps, including moving the proceedings to another building, in order to allow D to participate in the civil suit.

ILLUSTRATION 3: A State provides ten rest areas approximately 50 miles apart along an interstate highway. Program accessibility requires that an accessible toilet room for each sex with at least one accessible stall, or a unisex bathroom, be provided at each rest area.

Technical Assistance Manual § II-5.1000.   Plaintiffs maintain that the program in Illustration 2 is not the right to pursue or defend civil actions generally, but the right to fully participate in the litigation process.   Since the litigant could not participate in an inaccessible location, he was excluded from the program "when viewed in its entirety."   (Pl. Mem. at 21.)   Plaintiffs argue that the program at issue in this case is not the opportunity to vote, but the voting process that takes place at each voter's assigned, neighborhood polling location where voters can vote with friends and neighbors, meet and speak with election judges and party officials, and receive information about the candidates.   Consequently, if a voter is unable to vote at his or her assigned neighborhood polling location, he or she is excluded from the program.   Plaintiffs state that, in Illustration 3, each rest stop is a discrete program because of the distance between the stops.   Consequently, if fewer than all of the rest stops are accessible, "drivers will be subject to a *de facto* denial of access to the program." (Pl. Mem. at 19.)   Plaintiffs argue that, since voters are precluded from traveling to accessible polling places if their assigned polling places are inaccessible, each polling place must constitute a separate program of voting.

Plaintiffs also argue that Defendants' provision of the alternate ballot process allowing voting in City Hall does not change the fact that each polling place constitutes its own program.   Plaintiffs

22

note that almost all Philadelphia voters would have to travel significantly farther to City Hall than to their assigned polling places.  (<u>See</u> Defs. Obj. and Ans. to Pls. First Requests for Admissions, No. 28.)  In addition, disabled voters can vote at City Hall only if they apply for and meet the eligibility criteria for voting by alternative ballot.  <u>Pa. Voting Accessibility Procedures</u> § 9(b).  Plaintiffs also argue that voting at City Hall is not the same as voting in one's own local polling place with friends and neighbors and with access to the election information.

We find that Philadelphia's program of voting comprises its entire voting program, encompassing all of its polling locations throughout the City, as well as its alternative and absentee ballot programs.  Plaintiffs' argument that each individual polling location constitutes a separate program is not supported by the Illustrations.   Illustration 2 is inapposite since, in that illustration, the courthouse could remedy the discrimination by moving proceedings to an accessible building. Defendants have exercised that option in this case by allowing voting on election day in City Hall, which is an accessible building.  Moreover, the hardship placed on voters who travel to City Hall to vote is not similar to the hardship in Illustration 3 -- having to drive an additional fifty miles to use an accessible bathroom -- as no voter in Philadelphia would have to travel 50 miles to City Hall.  We have not ignored any hardship that traveling to City Hall, or voting by alternative ballot, might place on a disabled voter who cannot access his or her local polling place, or the fact that voters who take advantage of those options would not have the benefits of voting in their neighborhood polling locations.  However, we find that those factors are best considered in the determination of whether Philadelphia's entire program of voting violates the ADA and RA.  Consequently, we analyze Plaintiffs' claims of discrimination in the context of Defendants' entire, city-wide, program of voting.

2.        Plaintiffs' claims 1, 2 and 7 - program accessibility under the ADA and RA

Plaintiffs claim that the City's program of voting violates the ADA's and RA's program accessibility standards by failing to assure that the City's program of voting is readily accessible to and usable by individuals with disabilities.  See 28 C.F.R. § 35.150 and 28 C.F.R. § 41.57.  They also claim that, by failing to assure the accessibility of all of the City's polling places that can be made accessible, Defendants have violated the ADA and RA by excluding them from participation in, or denying them the benefits of, their program of voting in the manner that is available to non-disabled people, and by failing to afford them with equal opportunity to participate in the voting process.  See 28 C.F.R. §§  35.130(a) and 35.130(b)(1); 28 C.F.R. §§  41.51(a) and 41.51(b)(1).

The ADA's and RA's program accessibility standards do not require public entities, or recipients of federal financial assistance, to remove all structural and architectural barriers to individuals with mobility disabilities:

> Recognizing that failure to accommodate persons with disabilities will often have the same practical effect as outright exclusion, Congress required the States to take reasonable measures to remove architectural and other barriers to accessibility. [42 U.S.C.] § 12132. But Title II does not require States to employ any and all means to make judicial services accessible or to compromise essential eligibility criteria for public programs.  It requires only "reasonable modifications" that would not fundamentally alter the nature of the service provided, and only when the individual seeking modification is otherwise eligible for the service.  Ibid.  Title II's implementing regulations make clear that the reasonable modification requirement can be satisfied in various ways, including less costly measures than structural changes.

Tennessee v. Lane, 541 U.S. 509, 511 (2004).   The ADA's program accessibility standard with respect to existing facilities is set out in 28 C.F.R. § 35.150:

(a) General. A public entity shall operate each service, program, or

activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities. This paragraph does not--

(1) Necessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities; . . . .

(3) Require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens. . . . If an action would result in such an alteration or such burdens, a public entity shall take any other action that would not result in such an alteration or such burdens but would nevertheless ensure that individuals with disabilities receive the benefits or services provided by the public entity.

(b) Methods--(1) General. A public entity may comply with the requirements of this section through such means as redesign of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate accessible sites, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making its services, programs, or activities readily accessible to and usable by individuals with disabilities. A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance with this section . . . . In choosing among available methods for meeting the requirements of this section, a public entity shall give priority to those methods that offer services, programs, and activities to qualified individuals with disabilities in the most integrated setting appropriate.

28 C.F.R. § 35.150. The RA's program accessibility standard for existing facilities is set forth in 28

C.F.R. § 41.57:

A recipient shall operate each program or activity so that the program or activity, when viewed in its entirety, is readily accessible to and usable by handicapped persons. This paragraph does not necessarily require a recipient to make each of its existing facilities or every part of an existing facility accessible to and usable by handicapped persons.

25

28 C.F.R. § 41.57(a).

The evidence on the record of this Motion demonstrates that at least 26% of the City's polling divisions are not accessible by voters with mobility disabilities. On April 22, 2008, Plaintiffs found that 114 polling places serving 179 divisions that were designated by Defendants as accessible were inaccessible. Adding to that figure the 224 polling divisions that Defendants concede are located in inaccessible buildings, and the 24 polling places serving 39 polling divisions that Plaintiffs found were inaccessible on November 6, 2007 and were not included in Plaintiffs' April 22, 2008 survey, 442 of the City's polling divisions are located in inaccessible facilities. Consequently, Plaintiffs have submitted evidence that 442 polling divisions, comprising approximately 26% of the City's 1,681 polling divisions, are located in inaccessible facilities.[19]

Defendants argue that they are entitled to summary judgment on Plaintiffs' claims of discrimination under the ADA and RA despite the fact that a significant percentage of their polling locations are not accessible, because the City's entire program of voting is meaningfully open to voters with disabilities. They contend that their program of voting enables voters with mobility

---

[19]Defendants maintain, in contrast, that 84% of the City's polling divisions will be located in accessible facilities for the next election and that any accessibility problems found by Plaintiffs are, accordingly, isolated errors. Defendants have calculated the 84% accessibility figure by promising to correct the majority of the accessibility problems identified by Plaintiffs in their November 2007 and April 2008 polling place accessibility surveys. Defendants have indicated that they will install signs directing voters to accessible alternate entrances; correct designations for incorrectly designated polling places; and assure that ramps are installed and alternative accessible entrances are unlocked for future elections, thereby remedying the problems identified by Plaintiffs at the polling places they surveyed during the last two elections. (Defs. Reply Br. at 1 n.2; Lee Suppl. Decl. ¶ 16.) Unfortunately, at this stage of the litigation, we cannot rely on Defendants' assertions that certain problems will be fixed in the future. Moreover, it is clear from the record that Defendants were aware of some of these accessibility issues prior to the April 22, 2008 election, but failed to make corrections. We conclude, accordingly, that there is evidence on the record of this Motion that at least 26% of Philadelphia's polling divisions are assigned to facilities that were not accessible on election day.

disabilities to cast their ballots effectively, either at their neighborhood polling location or through

alternative or absentee ballots.  Defendants maintain that their alternative ballot process allows

voters to apply for, and utilize, alternative ballots by mail, apply for alternative ballots by phone or

in person at City Hall, and cast alternative ballots in person at City Hall or by having a designated

agent drop the ballot off at City Hall.[20]  (Pa. Voting Accessibility Procedures § 4.)  Indeed, mobility

disabled voters whose polling places are designated as accessible (but not FH), and who discover

on election day that they cannot access their polling place, are notified, through posters at the polling

place, that they may apply for emergency ballots at City Hall.  (See Pl. Ex. 29, Lee Dep. at 290, 292,

---

[20]Defendants further argue that the City's use of the alternative ballot process fulfills their accessibility obligations under the RA and ADA because alternative ballots are similar to absentee ballots.  Defendants note that the use of absentee ballots is sanctioned by federal law for persons with disabilities, military personnel, Americans living overseas, and voters who are out-of-town on election day.  See 42 U.S.C. § 1973ff-1(a)(1) (allowing states to "permit absent uniformed services voters and overseas voters to use absentee registration procedures and to vote by absentee ballot in general, special, primary, and runoff elections for Federal office") and 42 U.S.C. § 1973aa-1(d) (requiring the states to "provide by law for the casting of absentee ballots for the choice of electors for President and Vice President, or for President and Vice President" by all state voters who are "absent from their election district or unit in such State on the day such election is held").  Defendants argue that disabled voters are not entitled to greater access to neighborhood polling places than military voters or people who are away from home on election day and stress that, if absentee ballots are sufficient for the military, they should be sufficient for disabled voters.  Of course, Defendants clearly miss the point that the members of the class in this case, mobility disabled voters who live and vote in Philadelphia and who would like to vote in their assigned neighborhood polling places, are not out of town on election day, unlike military personnel or overseas voters.  We consequently find this argument unavailing.

Defendants further rely on NAACP v. Philadelphia Bd. of Elections, Civ. A. No. 97-7085, 1998 WL 321253 (E.D. Pa. June 16, 1998), for the proposition that Defendants' use of alternative ballot procedures fulfills their obligations under the ADA.  Id. at *3.  We have previously considered, and rejected, their reliance on this case, concluding that, "the specific issue at the center of this case, whether the ADA requires Defendants to take additional steps to avoid discrimination and provide equal access to the voting process, was not before the NAACP court.  Consequently, NAACP v. Philadelphia Bd. of Elections is not controlling here." Kerrigan v. Phila. Bd. of Election, Civ. A. No. 07-687, 2008 U.S. Dist. LEXIS 6365, at *12 (E.D. Pa. Jan. 29, 2008).  Defendants have not persuaded us that our previous rejection of NAACP was wrong.

297-98.)

Plaintiffs, however, argue that, under the ADA's program accessibility mandate, Defendants must give priority to making their polling places accessible rather than using alternative methods of voting, in order to ensure that disabled voters vote in the most integrated setting.  Plaintiffs rely on the Technical Assistance Manual:

> Public entities may achieve program accessibility by a number of methods. In many situations, providing access to facilities through structural methods, such as alteration of existing facilities and acquisition or construction of additional facilities, may be the most efficient method of providing program accessibility. The public entity may, however, pursue alternatives to structural changes in order to achieve program accessibility. Nonstructural methods include acquisition or redesign of equipment, assignment of aides to beneficiaries, and provision of services at alternate accessible sites. . . .
>
> When choosing a method of providing program access, a public entity must give priority to the one that results in the most integrated setting appropriate to encourage interaction among all users, including individuals with disabilities.

Technical Assistance Manual § II-5.2000.  Plaintiffs also contend that the alternative ballot process is not  truly equivalent to physical access to the program facilities because it does not afford voters with mobility disabilities access to the voting process that is as effective as accessible polling places. They maintain that the alternative ballot process results in segregated voting because voters who use the process vote in isolation from their non-disabled neighbors, thus violating the integrated setting element of the program access mandate.  See Id. and 28 C.F.R. § 35.150(b)(1).  Plaintiffs also contend that voters with mobility disabilities lack knowledge about the alternative ballot process (Mangum Dep. at 34; Davenport Dep. at 48; Kerrigan Dep. at 21-22, 32, 33; Ramnathsingh Dep. at 17; Ahmad Dep. at 20-22) and that the alternative ballot process is significantly more burdensome

28

than voting in one's assigned neighborhood polling place.

Plaintiffs argue that voting by alternative ballot is more burdensome than voting at one's assigned polling place on election day because it:  (1) requires voters with mobility disabilities to submit applications for alternative ballots at least one week prior to election day except in emergencies (Lee Decl. Ex. 3); (2) requires disabled voters to disclose the private nature of their disabilities (Lee Decl. Ex. 3); (3) requires disabled voters to either vote before election day, or make arrangements to travel to City Hall, or find someone else to travel to City Hall, to deliver their alternative ballots on election day, Pa. Voting Accessibility Procedures § 9(c); and, (4) is not available to voters with mobility disabilities who are assigned to polling places that Defendants have determined are accessible. Id. § 9(b).

Defendants maintain that the alternative ballot process is not overly burdensome.  They contend that the requirement that disabled individuals request an alternative ballot seven days prior to the election is not onerous, since those individuals may vote by emergency ballot at City Hall on election day if they fail to plan ahead.  Defendants further maintain, despite the contrary directions on the alternative ballot application, that voters applying for an alternative ballot because of a handicap do not need to provide information regarding their disability or physician.  (Lee Decl. Ex. 3.)  They also claim that they plan to clear up any confusing instructions to the contrary on the application form before the next election.  (Lee Suppl. Decl. ¶ 7.)  Defendants also deny that voters lack knowledge of the alternative and emergency ballot process, since the Board places notices including this information in local newspapers before every election, provides this information on its website, and provides poll workers with signs containing information about the emergency ballot process.  (Lee Dep. at 290, 292, 295-96; Ex. C to Defs. Reply Brief; Pls. Ex. 29.)  In addition, the

Disabilities Rights Network and the Committee of Seventy provide information on alternative voting procedures to the public.  (Thelen Decl. ¶¶ 2-4, Exs. D2-D5.)  Moreover, despite any contrary instructions on the emergency alternative ballot application,  Defendants contend that it is their practice to "accept voters' self-certification that their polling place is inaccessible, they have a disability," and that they have a reason for applying for an emergency ballot.  (Lee Dep. at 288-90.) We find, however, that at this stage of the litigation, we cannot rely on Defendants' representations that they take actions that contradict their own written procedures and the Commonwealth's directives with respect to alternative voting.  We also find that Plaintiffs have submitted evidence creating a genuine issue of material fact as to whether the alternative/absentee ballot procedure is more burdensome for disabled voters than voting in an accessible neighborhood polling place.

Plaintiffs also argue that the alternative/absentee ballot process cannot, by itself, satisfy Defendants' obligation to comply with the ADA's and RA's program access mandate because the program of voting in Philadelphia includes the opportunity to vote, as non-disabled voters do, in neighborhood polling places, where voters may vote with their neighbors, meet election judges and party officials, and obtain information from representatives of the candidates.  Defendants argue that Plaintiffs have failed to establish an entitlement to vote with friends and neighbors, meet local election judges and party officials, or gain access to information from candidate representatives at their assigned polling place on election day.  Defendants insist that the program of voting consists only of casting a ballot.

When deciding what elements are encompassed in Philadelphia's program of voting, we examine whether the challenged program is a normal government activity.  "Attempting to distinguish which public functions are services, programs, or activities, and which are not, would

disintegrate into needless hair-splitting arguments.  The focus of the inquiry, therefore, is not so much on whether a particular public function can technically be characterized as a service, program, or activity, but whether it is a normal function of a governmental entity."  Barden v. City of Sacramento, 292 F.3d 1073, 1076 (9th Cir. 2002) (internal quotations omitted); see also Yeskey v. Pennsylvania Dep't of Corrections, 118 F.3d 168, 171 (3d Cir. Pa. 1997) ("The regulations [promulgated under Title II of the ADA] state that the statute's coverage extends to 'all services, programs, and activities provided or made available by public entities.' [28 C.F.R.] § 35.102(a). This broad language is intended to 'apply to anything a public entity does.' Id. pt. 35, app. A, subpt. A at 456.").  There is no question that Philadelphia residents who vote in their local polling places may have the opportunity to talk with their neighbors and local party officials, election officials, and poll workers, and obtain candidate information.  Moreover, class members have expressed the desire to vote at their local polling places because they see their neighbors at their assigned polling place; they can obtain information about candidates at the polls; and because they want to vote "like normal people."  (Davenport Dep. at 48-49; Ahmad Dep. at 21-22; Magnum Dep. at 34-35.)  "The right to vote encompasses more than the right to gain physical access to a voting booth, to mark a ballot or pull a lever. Persons must have the opportunity to comprehend the registration and election forms and the ballot itself to cast an informed and effective vote.  The meaningful right to vote extends beyond the four corners of the voting machine."  United States v. Berks County, 277 F. Supp. 2d 570, 579 (E.D. Pa. 2003) (citation omitted).  Consequently, we find that, in the City of Philadelphia the program of voting includes the opportunity to vote in one's local, assigned, polling place, where the voter can take advantage of the opportunities to meet election judges, see their neighbors, and obtain information from candidates' representatives.

We conclude that failing to ensure that mobility disabled voters are able to vote in their neighborhood polling places, to the extent that the Defendants can do so, is a failure to provide mobility disabled voters with an equal opportunity to access the program of voting and violates the program access mandate.  See Westchester Disabled on the Move, Inc. v. County of Westchester, 346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004) ("Failing to ensure that disabled individuals are able to vote in person and at their assigned polling places--presumably the most commonly used method of voting--could not reasonably be construed as consistent with providing 'meaningful access' to the voting process, particularly where the alternatives relied upon by the Defendants impose additional costs, risks and inconveniences on disabled voters not faced by others.") We find that Plaintiffs have submitted sufficient evidence to create a genuine issue of material fact regarding whether Defendants' reliance on the alternative ballot, rather than making necessary modifications to make polling places accessible, violates the program accessibility mandate because it does not provide the program of voting in the most integrated setting.  We further find that Plaintiffs have submitted sufficient evidence of City polling locations that could have been made accessible on election day, but were not, to create a genuine issue of material fact as to whether Defendants have violated the ADA and the § 504 of the RA by failing to assure that polling places that could have been made accessible were accessible on election day.

3.    Plaintiffs' third and sixth claims - whether Defendants select inaccessible polling places and whether they have violated the integration mandate

Defendants argue that they are entitled to summary judgment on Plaintiffs' discriminatory site selection and integration mandate claims because Plaintiffs have no proof that they have not provided access to voting in the most integrated manner possible.  Defendants maintain that they

give priority to selecting accessible polling places and to providing access to voting in the most integrated settings. They conducted an accessibility evaluation of all polling places locations in 2002, and conducted two subsequent comprehensive searches to identify available accessible alternative polling locations. (Lee Decl. ¶¶ 22-23, 25.) Defendants further claim that they try to select the most accessible, appropriate polling place when they select new sites. (Lee Decl. ¶¶ 15, 27.) The Board selects public sites over private sites and will select an inaccessible site only if there are no accessible sites in the division or any adjacent division. (Lee Suppl. Decl. ¶ 15.) In addition, the Board works with the City and the School District to use accessible public buildings and schools as polling places. (Lee Decl. ¶¶ 12, 29-32.) The Board is also working with the City's Law Department to allow the City to pay for renovations to private polling places. (Lee Decl. ¶ 33, Lee Dep. at 87-88.) In addition, the Board makes some polling locations temporarily accessible by installing ramps. The Board has purchased 50 additional one-step ramps this year and plans to buy threshold ramps for the next election. (Lee Suppl. Decl. ¶ 13.)

We find, however, that the evidence on the record of this Motion demonstrates that there are genuine issues of material fact as to whether Defendants select inaccessible polling places and whether they give priority to providing access to voting in the most integrated settings. The transcripts of the hearings held by the City Commissioners regarding requests that polling places be moved from inaccessible to accessible locations show that the Commissioners have denied relocations to accessible facilities based upon unsworn verbal assurances that: (1) facilities were accessible where those facilities were not accessible for the April 22, 2008 election (Ward 2/Div. 25; Ward 15/Div.8; and Ward 47Divs. 1, 2); people who were not present at the hearing would install ramps at those locations, but those ramps were never installed (Ward 4/Divs. 3, 15; Ward 4/Div. 10;

Ward 4/Div. 16; Ward 10/Div. 9; Ward 11/Div. 14; Ward 15/Div. 15; Ward 33/Div. 4; Ward 39/Divs. 3, 20; and Ward 39/Div. 33); andseniors would not be willing to walk to the proposed new location (Ward 15/Div. 12; Ward 25/Div. 1; Ward 39/Div. 3, 20; Ward 39/Div. 33; Ward 41/Div. 2; Ward 41/Div. 23; Ward 58/Div. 25).  (See Appendix C.)  There is also evidence that Defendants could make other polling places temporarily accessible by installing temporary ramps on election day or by ensuring that alternative accessible entrances are marked with appropriate signs and unlocked for use by individuals with mobility disabilities, but they have not done so.  (Resnick Decl. ¶¶ 3-5, 8-9, 12-14; Shilliday Decl. ¶ 3; Davenport Decl. ¶ 3; Way Decl. ¶ 3; Johnson Decl. ¶¶ 3-4, 5; Parodi Decl. ¶ 4; Kane Decl. ¶ 3; Salandra Decl. ¶¶ 3, 5, 7-8; Keister Decl. ¶ 3; Goldstein Decl. ¶ 3; Jones Decl. ¶ 3;  Suppl. Kane Decl. ¶¶ 3-16; Suppl. Resnick Decl. ¶ 3-14, 16-20, 22-24, 26-29, 31-34; Suppl. Shilliday Decl. ¶¶ 3-4, 6-8, 10-11, 13-15, 17, 19-23; Turner Decl. ¶ 6-7, 9, 12-15, 17-25; Suppl. Salandra Decl. ¶¶ 3, 5-10, 12-13, 15-20, 23; Suppl. Johnson Decl. ¶¶ 4-5.) We further find, accordingly, that Plaintiffs have submitted sufficient evidence of Defendants' selection of inaccessible polling locations and failure to give priority to providing the program of voting in the most integrated setting, to create a genuine issue of material fact as to whether Defendants have violated the ADA and § 504 of the RA.

Defendants' Motion for Summary Judgment is, accordingly, denied as to their arguments that Plaintiffs have not satisfied their obligation to establish, as part of their prima facie case of discrimination, that they  are being excluded from participation in, being denied the benefits of, or being subjected to discrimination under the City's program of voting solely because of their disabilities in violation of Title II of the ADA and § 504 of the RA.

34

D.     Reasonable Modifications

Defendants argue that they are entitled to the entry of summary judgment in this case, even if Plaintiffs are able to establish a prima facie case of discrimination, because Plaintiffs have failed to satisfy their burden of articulating reasonable modifications.  The regulations implementing the ADA provide that:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7).  Defendants maintain that, in order to satisfy their burden of establishing the existence of reasonable modifications, Plaintiffs must identify all of the inaccessible polling locations that can be made accessible through modification or relocation as well as the type of modifications required or the locations where the polling places can be relocated.  Defendants maintain that Plaintiffs have identified reasonable modifications for only 32 polling places serving 41 divisions:[21]

1.     set up already provided portable ramps for four polling place serving five divisions: Ward 41/Divs 8,17, 18 (3 polling places) and Ward 51/Divs. 21 and 25 (one polling place);

2.     post signs directing mobility disabled voters to accessible alternative entrances at nine polling places serving eleven divisions: Ward 59/Div. 22; Ward 41/Divs. 6, 7 (one polling place); Ward 41/Divs. 13, 14 (one polling place); Ward 16/Div. 17; Ward 51/Div. 18; Ward 53/Div. 18; Ward 59/Div. 22; Ward 51/Div. 7; Ward 59/Div. 18.

3.     ensure that accessible alternative entrances are unlocked and can be opened by individuals with mobility disabilities and, in some cases, post appropriate signs in

---

[21]The record citations with respect to these polling places may be found in Appendices A and B.

nine polling locations serving 15 divisions: Ward 2/Div. 23; Ward 5/Div. 11; Ward 12/Div. 2; Ward 18/Divs. 14, 15 (one polling place); Ward 59/Div. 15; Ward 61/Divs. 2,3,4,7,8 (one polling place); Ward 61/Div. 5; Ward 61/Div. 21; Ward 61/Div. 22.

4.      provide and set up portable ramps at four polling locations: Ward 33/Div.16; Ward 39/Div. 42; Ward 30/Div. 4; Ward 3/Div. 6.

5.      relocate six polling locations: Ward 15/Div.12; Ward 17/Div.24; Ward 9/Div.33; Ward 3/Div. 10; Ward 61/Div. 9; Ward 4/Div. 16.

Plaintiffs state that, in addition to the specific reasonable modifications listed above, they have identified an additional 140 polling places that were inaccessible in the April 2008 election that could be made accessible through reasonable modifications such as the provision of temporary ramps at the primary entrances to polling places, minor modifications to alternative entrances (such as posting appropriate signs and unlocking doors) or relocation of inaccessible polling places to specific sites. These 140 polling places, serving 200 divisions, comprise the following:[22]

1.      55 Polling places serving 77 divisions with one step entrances, or door thresholds in excess of ½ inch, where Defendants either failed to provide portable ramps or failed to ensure that those ramps were in place and usable on election day: Ward 1/Div. 13; Ward 2/Div. 25; Ward 3/Div. 5; Ward 3/Div. 6 (the ramp provided was not the correct size for the step); Ward 4/Div. 19; Ward 5/Div. 7; Ward 5/Div. 14; Ward 5/Div. 19; Ward 6/Div. 13; Ward 7/Div.18; Ward 15/Div. 15; Ward 15/Div. 16; Ward 17/Div. 8; Ward 21/Div. 1; Ward 24/Div. 15, 16 (one polling place); Ward 26/Div. 23; Ward 27/Div. 1; Ward 29/Div. 15 and Ward 32/Divs. 4, 31 (one polling place); Ward 29/Div. 16; Ward 31/Div. 14; Ward 31/Div. 15; Ward 31/Div. 18; Ward 32/Div. 1; Ward 32/Div. 18 (ramp provided was not correct size for step); Ward 32/Div. 22; Ward 34/Div. 5 (ramp provided not correct size for step, interior step not ramped); Ward 34/Divs. 17, 28 (one polling place); Ward 36/Divs. 14, 24, 25, 27, 33(one polling place); Ward 36/Div. 29; Ward 36/Div. 34; Ward 38/Divs. 3, 4 (one polling place); Ward 39/Div. 6; Ward 39/Div. 18; Ward 40/Divs. 11, 26 (one polling place); Ward 40/Divs. 29, 43 (one polling place); Ward 41/Divs. 13, 14 (one polling place); Ward 41/Div. 18; Ward 41/Div. 24; Ward 43/Divs. 11, 12, 17, 18 (one polling place); Ward 44/Div. 10; Ward 45/Div. 23; Ward 46/Divs. 7, 22 (one polling place); Ward 49/Div. 12; Ward 52/Div. 17; Ward 53/Divs. 1, 2, 3 (one polling place);

---

[22]The record citations for these polling places may be found in Appendices A and B.

Ward 54/Div. 1; Ward 55/Divs. 16, 17, 18, 19, Ward 64/Div. 12 (one polling place); Ward 57/Div. 9; Ward 57/Div. 24; Ward 60/Div. 13; Ward 60/Div. 17; Ward 61/Div. 9; Ward 65/Div. 9; Ward 65/Divs. 15, 22 (one polling place).

2. 41 Polling places serving 75 divisions with alternative entrances that lacked appropriate signs at the primary entrance to inform voters about the availability of accessible alternative entrances, the alternative entrance was locked, and/or the alternative entrance had one step or a high threshold and could have been, but was not, ramped: Ward 1/Div. 18; Ward 2/Div. 1; Ward 2/Divs. 15, 26, 27 (one polling place); Ward 3/Div. 22, Ward 51/Divs. 19, 26, 27, 28 (one polling place); Ward 5/Div. 14; Ward 6/Div. 3; Ward 12/Div. 2; Ward 13/Divs. 16, 17, 22 (one polling place); Ward 15/Divs. 5, 8 (one polling place); Ward 21/Divs. 14, 16, 35 (one polling place); Ward 21/Div. 15; Ward 21/Div. 31; Ward 24/Divs. 4, 13 (one polling place); Ward 25/Div. 7; Ward 27/Div. 5; Ward 27/Div. 19; Ward 29/Div. 9; Ward 32/Divs. 21, 23, 24, 27 (one polling place); Ward 34/Div. 12; Ward 40/Divs. 17, 27, 39 (one polling place); Ward 40/Divs. 42, 44 (one polling place); Ward 41/Divs. 19, 20 (one polling place); Ward 42/Divs. 6, 22 (one polling place); Ward 46/Div. 5; Ward 46/Div. 16; Ward 47/Divs. 4, 5 (one polling place); Ward 48/Div. 7; Ward 49/Div. 1; Ward 51/Divs. 12, 13, 20 (one polling place); Ward 52/Div. 18; Ward 53/Divs. 17, 18 and Ward 56/Div. 3 (one polling place); Ward 54/Divs. 2, 3, 5 (one polling place); Ward 56/Divs. 16, 37 (one polling place); Ward 56/Div. 32; Ward 57/Div. 11; Ward 59/Div. 8; Ward 59/Divs. 21, 22 (one polling place); Ward 61/Divs. 2, 3, 4, 7, 8 (one polling place); Ward 61/Div. 25; Ward 64/Div. 1; Ward 64/Div. 2.

3. Two polling places serving three divisions were designated as AL or AN but the alternative entrance was locked: Ward 3/Div. 7; Ward 51/Divs. 15, 18 (one polling place).

4. One polling place that had an accessible exterior entrance but interior steps and the elevator was locked: Ward 49/Div. 23.

5. 41 inaccessible polling places serving 44 divisions that could be relocated to specified accessible sites identified by Plaintiffs: Ward 1/Div. 12; Ward 1/Div. 20; Ward 2/Div. 25; Ward 4/Div. 3; Ward 4/Div. 10; Ward 4/Div. 15; Ward 4/Div. 16; Ward 10/Div. 9; Ward 11/Div. 14; Ward 15/Div. 2; Ward 15/Div. 8; Ward 15/Div. 12; Ward 15/Div. 15; Ward 15/Div. 17; Ward 15/Div. 18; Ward 17/Div. 24; Ward 21/Div. 19; Ward 25/Div. 1; Ward 26/Divs. 15, 18 (one polling place); Ward 26/Div. 22; Ward 27/Div. 15; Ward 32/Div. 3; Ward 32/Div. 22; Ward 33/Div. 4; Ward 34/Div. 1; Ward 38/Div. 21; Ward 39/Div. 3; Ward 39/Div. 20; Ward 39/Div. 33; Ward 40/Div. 19; Ward 41/Div. 2; Ward 41/Div. 23; Ward 41/Div. 25; Ward 43/Divs. 7, 8 (one polling place); Ward 44/Div. 9; Ward 47/Divs. 1, 2 (one polling place); Ward 55/Div. 24; Ward 56/Div. 30; Ward 58/Div. 25; Ward 61/Div. 21;

Ward 61/Div. 23.[23]

We find that Plaintiffs have specified modifications which would make 159 polling locations serving 218 divisions accessible to mobility disabled voters.[24]

Plaintiffs also argue that they need not identify each inaccessible polling place in Philadelphia and make specific accessibility recommendations for each, but, rather, must simply identify the types of modifications they seek.  Plaintiffs further maintain that the evidence they have submitted is sufficient to establish that the modifications they seek are feasible and to secure the relief they seek - the appointment of an independent expert to review all polling places and make specific accessibility recommendations.  They also assert that the appointment of the requested expert would not prevent Defendants from asserting a fundamental alteration or undue burden defense as to specific polling places and, consequently, that this relief is consistent with the ADA's and RA's reasonable modification mandates.

Plaintiffs rely on Anderson v. Dep't of Pub. Welfare, 1 F. Supp. 2d 456 (E.D. Pa. 1998).[25]

---

[23]The record citations relevant to polling place relocations may be found in Appendix C.

[24]Defendants' list and Plaintiffs' list contain 13 duplicate polling locations serving 22 divisions: Ward 2/Div. 2; Ward 3/Div. 6; Ward 4/Div. 16; Ward 15/Div. 12; Ward 17/Div. 24; Ward 41/Divs. 13, 14 (one polling place); Ward 41/Div. 18; Ward 51/Divs. 15, 18 (one polling place); Ward 53/Divs. 17, 18 and Ward 56/Divs. 3 (one polling place); Ward 59/Divs. 21, 22 (one polling place); Ward 61/Divs. 2, 3, 4, 7, 8 (one polling place); Ward 61/Div. 9; Ward 61/Div. 21.

[25] Plaintiffs also rely on Frederick L., stating that the Third Circuit did not require the plaintiffs in that case to identify specific modifications for each plaintiff, but placed the burden on the Commonwealth.  Plaintiffs in Frederick L. were "a class of mental health patients institutionalized at [Norristown State Hospital] who are statutorily eligible for deinstitutionalization and who therefore seek integration into community-based healthcare programs." Frederick L., 422 F.3d at 154.  The Frederick L. plaintiffs claimed "that because they are qualified and prepared for community-based services, their continued institutionalization violates the anti-discrimination and integration mandates of the" ADA and Section 504 of the RA.  Id.  The Third Circuit placed the burden on the Commonwealth, rather than on plaintiffs, to come up with an overall integration plan

Plaintiffs in <u>Anderson</u> were mobility and visually impaired individuals who received Medical Assistance in Pennsylvania, and an organization serving such individuals. <u>Id.</u> at 461. They claimed that the defendants violated Title II of the ADA "first, by failing to require that all health care providers in DPW's mandatory managed care program practice in offices accessible to people with mobility impairments; second, by failing to provide all information related to the managed care program in alternative formats such as Braille, large print, and audiotape; and third, by using methods of administration that have discriminatory effects." <u>Id.</u> at 459.  The plaintiffs in <u>Anderson</u> claimed that the Commonwealth's managed care program could not "be an accessible program unless, inter alia, individuals with mobility impairments have physical access to the office of every participating health care provider." <u>Id.</u> at 463.  Plaintiffs claim that the <u>Anderson</u> plaintiffs were not required to identify each and every medical provider whose office was inaccessible or suggest reasonable modifications for each such office.  Nonetheless, the <u>Anderson</u> court found that the defendants in that case had violated the ADA and required providers to comply with the accessibility requirements of the ADA with respect to their offices. <u>Id.</u> at 469.

Plaintiffs also rely on <u>Kinney v. Yerusalim</u>, 812 F. Supp. 547 (E.D. Pa.), <u>aff'd</u> 9 F.3d 1067 (3d Cir. 1993).  The <u>Kinney</u> plaintiffs, disabled individuals who lived in or worked in Philadelphia, sued the Pennsylvania Secretary of Transportation and Philadelphia Streets Commissioner to compel

---

that specified the number and time frames for the discharge of class members. <u>Frederick L.</u>, 422 F.3d at 160.  However, the Commonwealth in that case was relying on the existence of its plan as a defense to plaintiffs' integration claim, pursuant to <u>Olmstead</u>, in which the Supreme Court: "noted that a state may defend against integration claims by providing 'a comprehensive, effectively working plan for placing qualified persons with mental disabilities in less restrictive settings, and a waiting list that moved at a reasonable pace not controlled by the State's endeavors to keep its institutions fully populated.'" <u>Id.</u> at 157 (quoting <u>Olmstead</u>, 527 U.S. at 605-606).  We find that <u>Frederick L.</u> is inapposite and does not support Plaintiffs' argument.

the City of Philadelphia to install curb cuts on all streets resurfaced since the ADA became effective. Id. at 548.  Plaintiffs maintain that the Kinney court did not require the plaintiffs in that case to identify every resurfaced street that did not have curb cuts before imposing systemic relief.  We agree that Plaintiffs need not identify every inaccessible polling place in Philadelphia, or specify the modifications needed to make each accessible, at this stage of this litigation.

Defendants further argue that the modifications Plaintiffs seek are patently unreasonable in light of their exorbitant cost and the minimal impact the requested review would have on the accessibility of the City's polling locations.  Defendants contend that the limited number of inaccessible polling places identified by Plaintiffs cannot justify a full scale review of all 1,681 of the City's polling divisions.  They also suggest that the proposed review could cost as much as $2 million.[26]  We find that Plaintiffs have submitted sufficient evidence of what appear to be simple and relatively inexpensive modifications that would make 159 of the polling places they visited accessible to create a genuine issue of material fact regarding whether they have satisfied their burden of proof of coming forward with reasonable modifications.  We further find that Defendants have not come forward with any evidence that Plaintiffs' request that we appoint an expert to assess the City's polling locations is unreasonable. Consequently, Defendants' Motion for Summary Judgment is denied as to Plaintiffs' obligation to identify reasonable modifications.

---

[26]Defendants estimate that it would take an expert three hours to visit, evaluate and analyze each polling division at $375/hour for all 1,681 polling locations.  (Defs. Reply Brief at 29 n.23.) The hourly rate Defendants use for the hypothetical expert is the hourly rate charged by Plaintiff's expert for his deposition testimony.  (Id. and Def. Reply Mem. Ex. P.)

E.     The VAEH

Defendants also argue that they are entitled to summary judgment because their use of the alternative ballot process is consistent with the VAEH, which they claim conflicts with and supersedes the ADA and RA with respect to polling place accessibility.  Defendants maintain that, since the VAEH supersedes the ADA and RA, Plaintiffs cannot prevail in this case unless they prove that Defendants have violated the VAEH.  Since Plaintiffs have not asserted a claim pursuant to the VAEH, and do not explicitly challenge Defendants' compliance with the VAEH, Defendants contend their claims must fail.

The VAEH specifically allows that a disabled voter, who is assigned to a polling place that has been designated as inaccessible in accordance with procedures promulgated by the Commonwealth of Pennsylvania, may be provided with an alternative ballot.  The VAEH provides, in relevant part, as follows:

> (a) Within each State, except as provided in subsection (b) of this section, each political subdivision responsible for conducting elections shall assure that all polling places for Federal elections are accessible to handicapped and elderly voters.
>
> (b) Subsection (a) of this section shall not apply to a polling place--
>
> (1) in the case of an emergency, as determined by the chief election officer of the State; or
>
> (2) if the chief election officer of the State--
>
> (A) determines that all potential polling places have been surveyed and no such accessible place is available, nor is the political subdivision able to make one temporarily accessible, in the area involved; and
>
> (B) assures that any handicapped or elderly voter assigned to an inaccessible polling place, upon advance request of such voter

41

(pursuant to procedures established by the chief election officer of the State)--

(i) will be assigned to an accessible polling place, or

(ii) will be provided with an alternative means for casting a ballot on the day of the election.

42 U.S.C. § 1973ee-1.

Defendants contend that the VAEH, ADA and RA are *in pari materia*. Two statutes are *in pari materia*, when they relate to the same subject matter. Wachovia Bank v. Schmidt, 546 U.S. 303, 315-16 (2006). When statutes are *in pari materia*, they "generally should be read 'as if they were one law.'" Id. (quoting Erlenbaugh v. United States, 409 U.S. 239, 243 (1972)). There are specific rules of construction for statutes which are *in pari materia*:

> Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute, unless it appears that the legislature intended to make the general act controlling.

In re Guardianship of Penn, 15 F.3d 292, 294 (3d Cir. 1994) (quoting Creque v. Luis, 803 F.2d 92, 94 (3d Cir. 1986)). Consequently, if there is a conflict between the ADA, RA and VAEH, " the more specific statute takes precedence over the more general one." Coady v. Vaughn, 251 F.3d 480, 484 (3d Cir. 2001) (citing Edmond v. United States, 520 U.S. 651, 657 (1997); Preiser v. Rodriguez, 411 U.S. 475, 488-89 (1973) and West v. Keve, 721 F.2d 91, 96 (3d Cir.1983)); see also Edmond v. United States, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs." (citing Busic v. United States, 446 U.S. 398, 406 (1980))).

Defendants state that the ADA, RA and VAEH are *in pari materia* because they all address

accessibility for voters with mobility disabilities and, consequently, they should be construed to give meaning to each.  Defendants maintain that, since the VAEH is the only one of these statutes to specifically address the accessibility of polling place buildings, it takes precedence over the ADA and RA.  Defendants further assert that the only plausible interpretation of the ADA and RA that gives meaning to the VAEH is that "when accessible polling places are not provided, alternative ballots assure that voting is readily accessible to, and usable by, people with disabilities as required by the ADA." (Def. Mem. at 30.) Defendants further contend that interpreting the ADA as requiring that every polling place be made accessible would render 42 U.S.C.A. § 1973ee-1(b)(2)(B)(ii) meaningless.

Plaintiffs maintain that the VAEH is not in *pari materia* with the ADA and RA because they do not address the same subject matter, as the ADA and RA apply to state and federal elections and the VAEH applies only to federal elections.  We find, however, that the VAEH, ADA and RA are *in pari materia* because they all apply to voting.[27]

Plaintiffs further maintain that the VAEH may be harmonized with the ADA and RA to require that Defendants maximize the number of accessible polling locations because the alternative ballot process under the VAEH is intended to be an alternative of last resort.  The legislative history of the VAEH supports their argument.  The Senate made it clear that one of the main objectives of the VAEH was to "improve the accessibility of polling and registration places . . . ." S. Rep. No. 98-590, at 2 (1984),  reprinted in 1984 U.S.C.C.A.N. 2801, 2802.  Another stated objective of the law

---

[27]We note that, although it is not required to do so by the VAEH, the Commonwealth of Pennsylvania requires county boards of elections to follow the <u>Pa. Voting Accessibility Procedures</u> for all elections, even if there is no election for a federal office on the ballot.  <u>Pa. Voting Accessibility Procedures</u> § 2.  Consequently, the VAEH is treated as though it applies to all elections in Pennsylvania.

was to "insure that those voters who wish to vote at an accessible polling site on the day of the election are given the opportunity to do so . . . ." Id.  The Senate allowed that, if there "was no accessible polling place and one could not be made even temporarily accessible[,]" an exception could be made to the mandate that all polling places be made accessible and a disabled voter could be reassigned to an accessible polling place or, if "provisions of state law . . . prohibit an individual from voting in a precinct or political subdivision other than the one in which such voter resides . . . the chief election officer would have the additional option of providing a voter with some other means for casting a ballot on the day of the election," including alternative ballots.  Id., 1984 U.S.C.C.A.N. at 2802-03.  It is, however, clear from the text of the VAEH and the Senate Report that the provision of alternative ballots was not meant to be the exception that swallowed the rule. Alternative ballots were to be provided only if there  "**was no accessible polling place and one could not be made even temporarily accessible**."  Id., 1984 U.S.C.C.A.N. at 2802 (emphasis added).

We find, accordingly, that there is no conflict between the VAEH and the RA and ADA in this case, and, consequently, there is no need to determine which statute should take precedence.  We are, therefore, required to read the statutes together, "as if they were one law."  Wachovia Bank, 546 U.S. at 315 (citation omitted).  Thus, we read the VAEH, together with the ADA and RA, to require Defendants to maximize the number of polling places that are accessible to individuals with mobility impairments, and to rely on the alternative voting process only as an alternative of last resort. Defendant's Motion is, therefore, denied as to their argument that the VAEH conflicts with and takes precedence over the ADA and RA.

44

F.    Failure to Join Necessary and Indispensable Parties

Defendants argue that this case should be dismissed because Plaintiffs have failed to join as defendants the Commonwealth of Pennsylvania and the owners of the private properties used as polling places in Philadelphia.  Federal Rule of Civil Procedure 19(a) requires that absent persons be joined as parties, where feasible, if:

>    (A) in that person's absence, the court cannot accord complete relief among existing parties; or
>    (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>       (i) as a practical matter impair or impede the person's ability to protect the interest; or
>       (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  If a necessary person has not been joined as a party, we "must order the person be made a party."  Fed. R. Civ. P. 19(a)(2).  If a party is necessary, but cannot be joined, we determine whether that party is indispensable, i.e., "whether, in equity and good conscience," we should allow the action to "proceed among the existing parties or [whether it] should be dismissed."  Fed. R. Civ. P. 19(b).  Defendants contend that the Commonwealth and the private polling place property owners are necessary and indispensable parties because they have interests that will be practically impaired or impeded if they do not participate in this case and because they are necessary to accord complete relief to Plaintiffs.

1.    The Commonwealth

Defendants argue that the Commonwealth's absence from this litigation will impede its ability to protect its interests relating to the subject of this action.  The subject of this litigation is the

accessibility of polling locations in Philadelphia.  As a result of the VAEH, the Commonwealth has

a clear and unmistakable interest in the accessibility of polling locations in Philadelphia.  Congress,

through the VAEH, has assigned to the Commonwealth the responsibility for ensuring that all

potential polling places in a given political subdivision have been surveyed for accessibility and for

determining whether an accessible polling place is available, or may be made temporarily available,

on election day.  42 U.S.C. § 1973ee-1(b)(2)(A).  Moreover, a mobility disabled voter may vote by

alternative ballot in the City of Philadelphia only if the chief election officer of the Commonwealth

has determined "that all potential polling places have been surveyed and no such accessible place

is available" and that the City is not able to make a polling place "temporarily accessible, in the area

involved . . . ."  42 U.S.C. § 1973ee-1(b)(2)(B).  The VAEH also requires the chief election officer

of the Commonwealth to report the number of inaccessible and accessible polling places in the state

every two years.  42 U.S.C. § 1973ee-1(c)(3).  In addition, the legislative history of the VAEH

clearly demonstrates that Congress intended to give the ultimate authority and responsibility for

assuring that polling places are accessible for mobility disabled voters to the Commonwealth.  See

S. Rep. No. 98-590, at 2, reprinted in 1984 U.S.C.C.A.N. 2801, 2802 ("Specifically, the bill would

give the chief election officer of each state the responsibility for promulgating guidelines to assure

accessibility of polling places.").

The Commonwealth issued the Pa. Voting Accessibility Procedures in order to carry out its

responsibilities under the VAEH.  Those procedures encompass accessibility surveys; designations

of inaccessibility; and the information regarding polling place accessibility the Secretary requires the

Board to include in its published election notices.  Pa. Voting Accessibility Procedures § 3.  The

Commonwealth also regulates the City's alternative ballot procedures and the use of absentee ballots

46

by individuals with disabilities.  Id. §§ 4, 5, 7-10.  The Commonwealth has also developed specific guidelines and procedures for determining polling place accessibility pursuant to its responsibilities under the VAEH.  See Guidelines and Definitions Issued by the Secretary of the Commonwealth For the Implementation of the Federal Voting Accessibility for the Elderly and Handicapped Act.  In addition, the Commonwealth has promulgated laws governing the location and relocation of polling places.  See 25 Pa. Stat. Ann. § 2726(a), 2 Pa. Cons. Stat. Ann. §§ 751, 752.

Plaintiffs argue that the Commonwealth is not an indispensable party in this case because it has effectively ceded its responsibilities under the VAEH to the City of Philadelphia.  Plaintiffs rely on the fact that, under the Pa. Voting Accessibility Procedures, it is the county boards of elections that survey polling places to determine accessibility, attempt to locate accessible polling places, make polling places temporarily accessible, and make polling place accessibility designations.  Pa. Voting Accessibility Procedures § 3.  Nonetheless, it is the responsibility of the Secretary of the Commonwealth to determine whether "all potential polling places have been surveyed and no . . . accessible place is available" so that the Board may utilize the alternative ballot procedures provided by the Commonwealth.  Id. § 1(c)(2)(ii).

In this lawsuit, Plaintiffs challenge Defendants' designations of polling place accessibility and use of the alternative ballot.  Consequently, a finding that Defendants have improperly surveyed polling places; improperly designated polling places as accessible; improperly rejected accessible alternate polling locations; and/or improperly utilized the alternative ballot, would, at the very least, imply malfeasance on the part of the Commonwealth.  In addition, Plaintiffs seek, in relief, the hiring of an expert to conduct accessibility surveys of each polling location in Philadelphia and ask that this Court decide whether any such recommendations must be implemented over Defendants' objection.

(Pls. Proposed Order for Inj. Relief ¶ 3.b., c.).  The relief Plaintiffs seek pursuant to the ADA and RA is integrally interwoven with the responsibilities imposed by Congress on the Commonwealth through the VAEH.  Congress has directed that the Commonwealth play an essential role with respect to the implementation and enforcement of federal rights related to the accessibility of polling places.  Clearly, principles of comity and federalism require us to recognize that the Commonwealth has an interest in the subject matter of this litigation which may be impaired or impeded in its absence. We find, accordingly, that the Secretary of the Commonwealth, who, as the chief election officer of Pennsylvania is charged with ensuring the Commonwealth's compliance with the directives of the VAEH, must be joined as a party to this action pursuant to Federal Rules of Civil Procedure 19(a)(1) and (2).  Defendants' Motion is, accordingly, granted with respect to their argument that Plaintiffs failed to join the Commonwealth of Pennsylvania a party.  As none of the existing parties to this suit contend that the Secretary of the Commonwealth cannot be joined as a party to this action, Plaintiffs are granted leave to file an amended complaint naming the Secretary of the Commonwealth as an additional defendant.

2.    Owners of private property used as polling places

Defendants argue that the owners of the private properties used by Defendants as polling places are also necessary and indispensable parties to this litigation.  Defendants maintain that we cannot grant complete relief to Plaintiffs in the absence of the private polling place property owners because we cannot order Defendants to modify privately owned property to make it accessible. Defendants rely on Westchester Disabled on the Move, 346 F. Supp. 2d at 479-80.  Plaintiffs in that case sued the County of Westchester under Title II of the ADA and state law, claiming that they had been discriminated against with respect to their right to vote because Westchester County's polling

48

places were inaccessible.  Westchester Disabled on the Move, 346 F. Supp. 2d at 475-76.  They sought a preliminary injunction ordering the defendant to evaluate the accessibility of its polling places and to modify its polling places to make them accessible by the next election.  Id. at 475. After finding that the inability to vote at their assigned polling places caused mobility disabled voters irreparable harm, the court denied the plaintiffs' motion for preliminary injunction on the ground that they were unlikely to succeed on the merits of their claim because the named defendants were unable to afford plaintiffs the complete relief they sought.  Id. at 477-80.  The Westchester Disabled court found that it "would be difficult, if not impossible" to make the necessary changes to the properties housing the county's polling places without the cooperation of the municipalities that owned most of those properties.  Id. at 479-80.

Defendants argue that, in this case, it would not be possible for them to make all of the polling places in Philadelphia accessible without the approval of the private property owners.  They claim that, "[w]hile third-party owners may be amenable to temporary alterations, it is likely many owners will not agree to permanent alterations to accommodate activities that occur in their buildings no more than twice a year." (Def. Mem. at 36.) Defendants further argue that it would be impossible to add all of the necessary third-party property owners to this suit because Plaintiffs have not identified all of the allegedly inaccessible polling places in the City that they contend should be modified.

Plaintiffs disagree, and insist that they have not requested any relief that would require Defendants to force private property owners to make their properties temporarily or permanently accessible.  Plaintiffs maintain that they seek only an order requiring Defendants to take steps within their current authority to identify and use accessible polling places.  If an inaccessible polling place

is located on private property, Plaintiffs suggest that Defendants have the following options:  1) determine whether temporary accessibility modifications are feasible and whether the property owner will agree to them; 2) if temporary modifications are not feasible, Defendants can use financial incentives to encourage property owners to make their properties accessible; or, 3) if temporary modifications are not feasible, and private property owners will not make permanent modifications to their properties, Defendants can relocate polling places to accessible sites unless it would be an undue burden or fundamental alteration to do so.  Plaintiffs maintain that these steps would afford them complete relief without prejudicing the rights of private property owners.  We agree.  We find that the owners of the private properties used as polling places in the City of Philadelphia are not necessary and indispensable parties to this litigation because their property interests would not be impaired in their absence and because Plaintiffs can achieve complete relief without their participation.  Defendants' Motion is, accordingly, denied with respect to their argument that Plaintiffs have failed to name the private polling place property owners as defendants in this action.

       G.      Claims Against the Board of Elections and the Individual City Commissioners

Defendants argue that the Board of Elections and the individual City Commissioners should be dismissed as Defendants in this case and suggest that the only proper Defendant would be the City of Philadelphia.  Defendants maintain that, under state law, City Departments, such as the Board, do not have a separate corporate existence and, therefore, all suits against a department of the city should be brought against the City.  See 53 Pa. Stat. Ann. § 16257; Philadelphia Entm't & Dev. Partners, L.P. v. City of Philadelphia 939 A.2d 290, 292 (Pa. 2007) (agreeing that city "agencies must be sued only in the name of the City").

The county boards of elections were established by 25 Pa. Stat. Ann. § 2625, which was

enacted on June 3, 1937.  In 1968, Article IX, Section 13 of the Pennsylvania Constitution abolished all of the county offices in Philadelphia and assigned the functions of those offices to the City:  "In Philadelphia all county offices are hereby abolished, and the city shall henceforth perform all functions of county government within its area through officers selected in such manner as may be provided by law."  Pa. Const. Art. IX, § 13.  A later statute, 25 Pa. Cons. Stat. Ann. § 1203, which became effective on March 17, 2002, created commissions to oversee voter registration.  In cities of the first class, of which Philadelphia is the only one, the registration commission consists of the "three elected commissioners of the city."  25 Pa. Cons. Stat. Ann. § 1203(b)(2).  Indeed, it is the "mission of the City Commissioners [of Philadelphia] to administer Voter Registration and conduct Elections in accordance with Federal and State voter registration and election laws."  Mission Statement of the Philadelphia City Commissioners, available at http://www.phillyelection.com/miseng.htm (last visited August 8, 2008).  We find that Defendants have submitted ample authority to support their argument that the Board is a department of the Philadelphia city government and not a separate entity and that the City, through its Commissioners, administer voter registration and elections.  Plaintiffs have cited no authority to the contrary.[28]  Defendants' Motion is, accordingly, granted to the extent that they seek dismissal of the Board. Plaintiffs are granted leave to file an amended complaint naming the City of Philadelphia as a defendant in this case, in place of the Board.

---

[28]In opposition to Defendants' argument, Plaintiffs rely on the fact that the Board of Elections does not appear as a department of the City in the Philadelphia Home Rule Charter and the fact that the Board has been named as a defendant in two other cases:  NAACP v. Philadelphia Bd. of Elections, Civ. A. No. 97-7085, 1998 WL 321253 (E.D. Pa. 1998) and Pennsylvania Gaming Control Bd. v. City Council of Philadelphia, 928 A.2d 1255 (Pa. 2007).  It does not appear, however, that this specific issue was considered in either of those cases.

Defendants also argue that the claims brought against the City Commissioners in their official capacities should be dismissed because they are redundant of the claims brought against the Board (which will be replaced as a defendant by the City of Philadelphia).  Where a suit is brought against a public officer in his official capacity, the suit is treated as if the suit were brought against the governmental entity of which he is an officer.  Brandon v. Holt, 469 U.S. 464, 471-72 (1985); see also Kentucky v. Graham, 473 U.S. 159, 165 (1985) (stating that "[o]fficial capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent").  Plaintiffs maintain that their claims against City Commissioners may not be redundant in this case because Defendants have raised the following affirmative defense: "[t]o the extent that the City acts as the agent of the Commonwealth, plaintiffs' claims are barred by the Eleventh Amendment of the United States Constitution."  (Defs. Ans. and Affirmative Defenses, Affirmative Defense 6.)   Plaintiffs argue that, if Defendants are successful in asserting their Eleventh Amendment defense, the City Commissioners would be the only appropriate defendants remaining in this action, since the Eleventh Amendment does not bar state officials from being sued in their official capacities for injunctive relief.  See Koslow v. Commonwealth of Pennsylvania, 302 F.3d 161, 179 (3d Cir. 2002) (stating that "federal ADA claims for prospective injunctive relief against state officials are authorized by the Ex parte Young doctrine").  Moreover, although we may dismiss claims asserted against officials acting in their official capacity in these circumstances, it is not mandatory that we do so.  See Delguerico v. Springfield Township, Civ. A. No. 02-3453, 2002 WL 32341774, at *7 (E.D. Pa. Nov. 26,2002) ("While it is true that a claim against an official acting in his official capacity is treated as a claim against the municipality, 'this proposition does not stand for the legal principle that the claims against an individual defendant in his official capacity must

be dismissed where the governmental entity or municipality is also named.'" (quoting <u>Dieterly v. Sorrenti</u>, Civ. A. No. 92-4078, 1992 WL 310302, at *8 n.3 (E.D. Pa. Oct. 22, 1992))). Consequently, we decline to dismiss the claims asserted against the City Commissioners in their official capacities. Defendants' Motion for Summary Judgment is, accordingly, denied with respect to their argument that the claims asserted against the City Commissioners should be dismissed as redundant.

IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion is granted as to their claim that Plaintiffs have failed to join a necessary party - the Commonwealth of Pennsyvlania.  Defendants' Motion is also granted as to their claim that the Board of Elections is not a proper party to this action.  Defendants' Motion is denied in all other respects.  Within ten days of the date of this Memorandum, Plaintiffs may file an amended complaint naming the Secretary of the Commonwealth of Pennsylvania and the City of Philadelphia as Defendants.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KATHLEEN KERRIGAN, ET AL.          :          CIVIL ACTION
                                   :
              v.                   :
                                   :
THE PHILADELPHIA BOARD             :
OF ELECTIONS, ET AL.               :          NO. 07-687

**O R D E R**

**AND NOW,** this 14th day of August, 2008, upon consideration of Defendants' Motion for

Summary Judgment (Docket No. 59), all documents filed in connection therewith, and the argument

held on July 31, 2008, **IT IS HEREBY ORDERED** that the Motion is **GRANTED IN PART AND**

**DENIED IN PART** as follows:

1.  Defendants' Motion is **GRANTED** as to their argument that Plaintiffs have failed to

    name a necessary and indispensable party, namely the Commonwealth of

    Pennsylvania.

2.  Defendants' Motion is **GRANTED** as to their argument that the Philadelphia Board

    of Elections is not a proper Defendant in this suit.  The Philadelphia Board of

    Elections is **DISMISSED** as a Defendant in this suit.

3.  Defendants' Motion is **DENIED** in all other respects.

4.  Plaintiffs are granted leave to file an amended complaint within ten (10) days of the

    date of this Order naming the Secretary of the Commonwealth of Pennsylvania and

    the City of Philadelphia as Defendants.

5.  The hearing on Plaintiffs' Motion for Permanent Injunction is continued.  It will be

    rescheduled at some time after counsel for the Secretary of the Commonwealth and

    the City of Philadelphia have entered their appearances in this case.

6.      Defendants' Motion to Amend Answer is **DISMISSED** as moot.


                              BY THE COURT:

                              /s/ John R. Padova

_____
                              John R. Padova, J.